1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
Claude M. Stern (Bar No. 96737)
2 | claudestern@quinnemanuel.com
555 Twin Dolphin Drive, Suite 560
3 | Redwood Shores, California 94065-2139
Telephone: (650) 801-5000
4 | Facsimile: (650) 801-5100

5 | Christopher E. Stretch (Bar No. 166752)
chrisstretch@quinnemanuel.com
6 | Carl G. Anderson (Bar No. 239927)
carlanderson@quinnemanuel.com
7 | 50 California Street, 22nd Floor
San Francisco, California 9411
8 |
Attorneys for MACROVISION
9 | CORPORATION

**ORIGINAL FILED**

MAR 1 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

*BZ*

10

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14 | MACROVISION CORPORATION,          CASE NO.

15 |            Plaintiff,             COMPLAINT FOR PATENT INFRINGEMENT

16 |       vs.                        Demand for Jury Trial

17 | UNILOC USA, INC. and UNILOC       Date Filed: March 13, 2008
(SINGAPORE) PRIVATE LIMITED,
18 |
            Defendant.
19

20

21

22

23

24

25

26

27

28 | **COPY**

Case No.

1

## COMPLAINT

2       Plaintiff Macrovision Corporation (hereinafter "Macrovision"), by and

3   through its undersigned attorneys, for its Complaint against Defendants Uniloc

4   USA, Inc. and Uniloc (Singapore) Private Limited (collectively "Uniloc" or

5   "Defendants") alleges as follows:

6

7

## JURISDICTION AND VENUE

8       1.      This action arises under the patent laws of the United States, 35

9   U.S.C. § 101 et seq. This Court has original jurisdiction over the patent

10  infringement claims in this action under 28 U.S.C. §§ 1331 and 1338(a).

11      2.      Venue is established in this judicial district pursuant to 28 U.S.C. §§

12  1391(c) and/or 1400(b).

13

14

## INTRADISTRICT ASSIGNMENT

15      3.      Pursuant to Civil Local Rule 3-2(c), this action is an Intellectual

16  Property Action to be assigned on a district-wide basis.

17

18

## PARTIES

19      4.      Macrovision is a California corporation with a principal place of

20  business at 2830 De La Cruz Boulevard, Santa Clara , CA 95050. Macrovision is

21  the owner by assignment of United States Patent Nos. 6,202,056, 6,889,206,

22  7,089,315, 6,802,006, and 6,510,516 (collectively the "Asserted Patents").

23  Macrovision is the owner of all rights to bring suit for infringement of the Asserted

24  Patents.

25      5.      Macrovision is informed and believes that Uniloc is a corporation

26  existing under the laws of Rhode Island, and Uniloc (Singapore) Private Limited is

27  a limited liability company existing under the laws of Singapore. Uniloc's global

28

51355/2432972.1                            -2-                    Case No._____

1     headquarters and principle place of business are located at 3333 Michelson Drive,
2     Suite 600, Irvine, CA 92612.

3         6.     Macrovision is informed and believes that Defendant Uniloc conducts
4     substantial business in the State of California and this district; maintains a website
5     on the Internet at http://redsky.uniloc.com, which is accessible in this district; and
6     causes and induces infringement in this district.

7

8                       **FACTUAL BACKGROUND**

9         7.     Macrovision is a global leader in protection, enablement and
10     distribution solutions that empower consumers to discover, acquire, manage and
11     enjoy digital content.

12         8.     Macrovision owns all rights, title, and interest in U.S. Patent No.
13     6,202,056 ("the '056 Patent"), entitled "Method for Computer Network Operation
14     Providing Basis For Usage Fees", attached hereto as Exhibit A.

15         9.     Macrovision owns all rights, title, and interest in U.S. Patent No.
16     6,889,206 ("the '206 Patent"), entitled "Method For Computer Network Operation
17     Providing Basis For Usage Fees", attached hereto as Exhibit B.

18         10.     Macrovision owns all rights, title, and interest in U.S. Patent No.
19     7,089,315 ("the '315 Patent"), entitled "Method For Computer Network Operation
20     Providing Basis For Usage Fees", attached hereto as Exhibit C.

21         11.     Macrovision owns all rights, title, and interest in U.S. Patent No.
22     6,802,006 ("the '006 Patent"), entitled "System And Method Of Verifying The
23     Authenticity Of Dynamically Connectable Executable Images", attached hereto as
24     Exhibit D.

25         12.     Macrovision owns all rights, title, and interest in U.S. Patent No.
26     6,510,516 ("the '516 Patent"), entitled "System and Method for Authenticating
27     Peer Components", attached hereto as Exhibit E.

28

1        13.    Macrovision has complied with the requirements of 35 U.S.C. Section

2  287(a).

3        14.    Defendants, through their SoftAnchor software product have, without

4  license or permission from Macrovision, made, used, offered for sale, sold and/or

5  imported into the United States, and continue to make, use, offer to sell and/or sell

6  software security products and services that directly infringe, induce infringement

7  or contributorily infringe one or more claims of each of the Asserted Patents.

8        15.    In light of Macrovision's wide success and renown in the field of

9  protecting enabling and distributing software solutions, and Uniloc's knowledge

10  and awareness of same, Macrovision is informed and believes that, prior to the

11  commencement of this suit and the filing of this complaint, Uniloc was aware of

12  the Asserted Patents and, in conscious disregard of any or all of them, Uniloc

13  knowingly infringed one or more claims of the Asserted Patents.

14

15  **CLAIM I -- PATENT INFRINGEMENT (U.S. PATENT NO. 6,202,056)**

16        16.    Plaintiff realleges and incorporates by reference paragraphs 1 through

17  18, inclusive, as though fully set forth in this paragraph.

18        17.    Macrovision owns all rights, title, and interest in U.S. Patent No.

19  6,202,056 ("the '056 Patent"), entitled "Method for Computer Network Operation

20  Providing Basis For Usage Fees", attached hereto as Exhibit A.  The '056 Patent

21  was duly and legally issued by the United States Patent and Trademark Office on

22  March 13, 2001.

23        18.    Defendants have been making, using, offering for sale, selling, or

24  importing into the United States and this District their SoftAnchor product which

25  has directly infringed one or more claims of the '056 Patent.

26        19.    Defendants, through their use, manufacture, sale, offering for sale and

27  importing into the United States of their SoftAnchor product have actively induced

28  others to infringe one or more claims of the '056 Patent and/or have contributed to

-4-

1  the infringement of one or more of these claims by Defendants' customers and/or
2  their products.

3      20.    Defendants are not licensed or otherwise authorized by Macrovision to
4  make, use, offer for sale, sell or import the above identified product which
5  infringes one or more claims of the '056 Patent.

6      21.    Defendants' activities render them guilty of infringing one or more
7  claims of the '056 Patent, under 35 U.S.C. § 271.

8      22.    By reason of Defendants' infringing activities, Macrovision has
9  suffered substantial damages in an amount to be proven at trial.

10

11  **CLAIM II -- PATENT INFRINGEMENT (U.S. PATENT NO. 6,889,206)**

12      23.    Plaintiff realleges and incorporates by reference paragraphs 1 through
13  25, inclusive, as though fully set forth in this paragraph.

14      24.    Macrovision owns all rights, title, and interest in U.S. Patent No.
15  6,889,206 ("the '206 Patent"), entitled "Method For Computer Network Operation
16  Providing Basis For Usage Fees", attached hereto as Exhibit B.  The '206 Patent
17  was duly and legally issued by the United States Patent and Trademark Office on
18  May 3, 2005.

19      25.    Defendants have been making, using, offering for sale, selling, or
20  importing into the United States and this District their SoftAnchor product which
21  has directly infringed one or more claims of the '206 Patent.

22      26.    Defendants, through their use, manufacture, sale, offering for sale and
23  importing into the United States of their SoftAnchor product, have actively induced
24  others to infringe one or more claims of the '206 Patent and/or have contributed to
25  the infringement of one or more of these claims by Defendants' customers and/or
26  their products.

27

28

1    27.   Defendants are not licensed or otherwise authorized by Macrovision to

2  make, use, offer for sale, sell or import the above identified product which

3  infringes one or more claims of the '206 Patent.

4    28.   Defendants' activities render them guilty of infringing one or more

5  claims of the '206 Patent, under 35 U.S.C. § 271.

6    29.   By reason of Defendants' infringing activities, Macrovision has

7  suffered substantial damages in an amount to be proven at trial.

8

9  **CLAIM III -- PATENT INFRINGEMENT (U.S. PATENT NO. 7,089,315)**

10    30.   Plaintiff realleges and incorporates by reference paragraphs 1 through

11  32, inclusive, as though fully set forth in this paragraph.

12    31.   Macrovision owns all rights, title, and interest in U.S. Patent No.

13  7,089,315 ("the '315 Patent"), entitled "Method For Computer Network Operation

14  Providing Basis For Usage Fees", attached hereto as Exhibit C.  The '315 Patent

15  was duly and legally issued by the United States Patent and Trademark Office on

16  August 8, 2006.

17    32.   Defendants have been making, using, offering for sale, selling, or

18  importing into the United States and this District their SoftAnchor product which

19  has directly infringed one or more claims of the '315 Patent.

20    33.   Defendants, through their use, manufacture, sale, offering for sale and

21  importing into the United States of their SoftAnchor product, have actively induced

22  others to infringe one or more claims of the '315 Patent and/or have contributed to

23  the infringement of one or more of these claims by Defendants' customers and/or

24  their products.

25    34.   Defendants are not licensed or otherwise authorized by Macrovision to

26  make, use, offer for sale, sell or import the above identified product which

27  infringes one or more claims of the '315 Patent.

28

1    35.    Defendants' activities render them guilty of infringing one or more

2    claims of the '315 Patent, under 35 U.S.C. § 271.

3    36.    By reason of Defendants' infringing activities, Macrovision has

4    suffered substantial damages in an amount to be proven at trial.

5

6    **CLAIM IV -- PATENT INFRINGEMENT (U.S. PATENT NO. 6,802,006)**

7    37.    Plaintiff realleges and incorporates by reference paragraphs 1 through

8    39, inclusive, as though fully set forth in this paragraph.

9    38.    Macrovision owns all rights, title, and interest in U.S. Patent No.

10   6,802,006 ("the '006 Patent"), entitled "System And Method Of Verifying The

11   Authenticity Of Dynamically Connectable Executable Images", attached hereto as

12   Exhibit D.  The '006 Patent was duly and legally issued by the United States Patent

13   and Trademark Office on October 5, 2004.

14   39.    Defendants have been making, using, offering for sale, selling, or

15   importing into the United States and this District their SoftAnchor product which

16   has directly infringed one or more claims of the '006 Patent.

17   40.    Defendants, through their use, manufacture, sale, offering for sale and

18   importing into the United States of their SoftAnchor product, have actively induced

19   others to infringe one or more claims of the '006 Patent and/or have contributed to

20   the infringement of one or more of these claims by Defendants' customers and/or

21   their products.

22   41.    Defendants are not licensed or otherwise authorized by Macrovision to

23   make, use, offer for sale, sell or import the above identified product which

24   infringes one or more claims of the '006 Patent.

25   42.    Defendants' activities render them guilty of infringing one or more

26   claims of the '006 Patent, under 35 U.S.C. § 271.

27   43.    By reason of Defendants' infringing activities, Macrovision has

28   suffered substantial damages in an amount to be proven at trial.

## CLAIM V -- PATENT INFRINGEMENT (U.S. PATENT NO. 6,510,516)

44.    Plaintiff realleges and incorporates by reference paragraphs 1 through 46, inclusive, as though fully set forth in this paragraph.

45.    Macrovision owns all rights, title, and interest in U.S. Patent No. 6,510,516 ("the '516 Patent"), entitled "System and Method for Authenticating Peer Components", attached hereto as Exhibit E. The '516 Patent was duly and legally issued by the United States Patent and Trademark Office on January 21, 2003.

46.    Defendants have been making, using, offering for sale, selling, or importing into the United States and this District their SoftAnchor product which has directly infringed one or more claims of the '516 Patent.

47.    Defendants, through their use, manufacture, sale, offering for sale and importing into the United States of their SoftAnchor product, have actively induced others to infringe one or more claims of the '516 Patent and/or have contributed to the infringement of one or more of these claims by Defendants' customers and/or their products.

48.    Defendants are not licensed or otherwise authorized by Macrovision to make, use, offer for sale, sell or import the above identified product which infringes one or more claims of the '516 Patent.

49.    Defendants' activities render them guilty of infringing one or more claims of the '516 Patent, under 35 U.S.C. § 271.

50.    By reason of Defendants' infringing activities, Macrovision has suffered substantial damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Macrovision respectfully prays for judgment against Defendants as follows:

1      (a)    A declaration that Defendants have directly infringed, actively induced
2  others to infringe and/or contributed to the infringement of United States Patent
3  No. 6,202,056;

4      (b)    A declaration that Defendants have directly infringed, actively induced
5  others to infringe and/or contributed to the infringement of United States Patent
6  No. 6,889,206;

7      (c)    A declaration that Defendants have directly infringed, actively induced
8  others to infringe and/or contributed to the infringement of United States Patent
9  No. 7,089,315;

10      (d)    A declaration that Defendants have directly infringed, actively induced
11  others to infringe and/or contributed to the infringement of United States Patent
12  No. 6,802,006;

13      (e)    A declaration that Defendants have directly infringed, actively induced
14  others to infringe and/or contributed to the infringement of United States Patent
15  No. 6,510,516;

16      (f)    An award to Plaintiff Macrovision of all available and legally
17  permissible damages caused by Defendants' infringing acts, but in no event less than
18  a reasonable royalty and prejudgment interest thereon;

19      (g)    A declaration that Defendants' infringing acts amount to willful patent
20  infringement, and on such basis, an award of damages up to three times the amount
21  of actual damages proven;

22      (h)    That the Court enter a preliminary and permanent injunction barring
23  Defendants, its officers, agents, servants, employees and attorneys, alter egos and
24  their successors and assigns, as well as those persons in active concert or
25  participation with them who receive actual notice of the judgment, from infringing,
26  actively inducing the infringement of and/or contributing to the infringement of any
27  claim of the '056 Patent, the '206 Patent, the '315 Patent, the '006 Patent, and the
28  '516 Patent, including but not limited to making, importing, using, offering for sale,

1  or selling any devices or systems that infringe, or using processes that infringe the

2  '056 Patent, the '206 Patent, the '315 Patent, the '006 Patent, and the '516 Patent.

3  (i)    A declaration that this case is exceptional under 35 U.S.C. § 285, and

4  on such basis, an award of attorney fees for Plaintiff Macrovision against

5  Defendants;

6  (j)    An award to Plaintiff Macrovision of costs, pre-judgment and post-

7  judgment interest; and

8  (k)    An award to Plaintiff Macrovision of such other and further legal and

9  equitable relief as this Court deems just and proper.

10

11  DATED: March 13, 2008              Respectfully submitted,

12                                     QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP

13

14                                     By

15                                        Claude M. Stern
                                          Attorneys for Macrovision Corporation

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## JURY DEMAND

2      Pursuant to Fed. R. Civ. P. 38(b), Macrovision demands a trial by jury

3   on all matters and issues triable by jury.

4

5   DATED:  March  13, 2008            Respectfully submitted,

6                                      QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
7

8                                      By_____

9                                      Claude M. Stern
                                       Attorneys for Macrovision Corporation

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

US006202056B1

(12) **United States Patent**    (10) Patent No.:    **US 6,202,056 B1**
Nuttall    (45) Date of Patent:    **\*Mar. 13, 2001**

(54) **METHOD FOR COMPUTER NETWORK OPERATION PROVIDING BASIS FOR USAGE FEES**

(75) Inventor: **François-Xavier Nuttall**, Prevessin (FR)

(73) Assignee: **Audiosoft, Inc.**, San Francisco, CA (US)

( \* ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/055,068**

(22) Filed: **Apr. 3, 1998**

(51) Int. Cl.[7] ........................................... G06F 17/30
(52) U.S. Cl. ........................ 705/52; 705/44; 709/238
(58) Field of Search ........................ 705/35, 14, 26, 705/39, 44; 380/25

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,658,093 | 4/1987 | Hellman | 380/25 |
| 5,050,213 \* | 9/1991 | Shear | 705/53 |
| 5,592,511 | 1/1997 | Schoen et al. | 375/220 |
| 5,634,012 | 5/1997 | Stefik et al. | 705/39 |
| 5,715,403 \* | 2/1998 | Stefik | 705/44 |
| 5,765,152 \* | 6/1998 | Erickson | 707/9 |
| 5,870,562 \* | 2/1999 | Butman et al. | 709/238 |
| 5,907,617 \* | 5/1999 | Ronning | 705/52 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO 9809209 | 3/1998 | (WO) . |
| WO 9810381 | 3/1998 | (WO) . |

OTHER PUBLICATIONS

Bernstein, et al., "Copyrights, Distribution Chains, Integrity and Piracy: The Need for a Standards–based Solution", Proceedings of the Knowright Conference, Proceedings of the International Congress on Intellectual Property Rights for Specialized Information, Knowledge and New Technology, p. 344, p. 350.

\* cited by examiner

Primary Examiner—Kevin J. Teska
Assistant Examiner—Demetra R. Smith
(74) Attorney, Agent, or Firm—William R. Bachand; Michael A. Lechter; Squire, Sanders & Dempsey L.L.P.

(57)    **ABSTRACT**

A computer network having a requesting node and a providing node permits data transfer therebetween when permitted by an authorizing node. Reports generated in response to authorizations and reports generated in response to data transfers are reconciled at a reconciliation node to improve the accuracy of payments collected and paid for use of the data. Such payments include copyright royalties for audio, video, and other works recorded in digital format.

**21 Claims, 19 Drawing Sheets**





FIG. 1



FIG. 2

Case 4:08-cv-01447-SBA    Document 1-2    Filed 03/13/2008    Page 5 of 28



FIG. 3

Case 4:08-cv-01447-SBA    Document 1-2    Filed 03/13/2008    Page 6 of 28



FIG. 4

502

| Report | | | | | Reconciliation Result |
|---|---|---|---|---|---|
| A | B | C | D | E | |
| Y | Y | Y | Y | Y | Normal request/payment |
| Y | Y | N | N | X | Failed CRN |
| N | N | Y | X | X | Failed CRN |
| N | N | X | Y | X | Failed CRN |

504
506
508
510

Y = Yes

N = No

X = Don't Care

FIG. 5

Case 4:08-cv-01447-SBA     Document 1-2     Filed 03/13/2008     Page 8 of 28



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10

Case 4:08-cv-01447-SBA    Document 1-2    Filed 03/13/2008    Page 13 of 28



FIG. 11



FIG. 12

Case 4:08-cv-01447-SBA    Document 1-2    Filed 03/13/2008    Page 15 of 28

1300 ⌐

| MAP FILE |
|---|
| map.content.version |
| map.CPN.node.address.pathname.quality.level  1 |
| map.CPN.node.address.pathname.quality.level  2 |
| map.CPN.node.address.pathname.quality.level  3 |
| . . . |
| map.CPN.node.address.pathname.quality.level  N |

FIG.  13

1400

| CONTENT FILE HEADER |
|---|
| content.version |
| content.title |
| content.artist |
| content.copyright |
| content.date.recording |
| content.size |
| content.listen.begin |
| content.listen.duration |
| content.ID.code.type |
| content.ID.code.number |
| content.watermark.tech |
| content.legal.duration |
| content.file.number |
| content.usage.counter |
| content.CPN.node.address |
| content.generation.number |
| content.date.start.validity |
| content.date.stop.validity |
| content.encrypt.tech |
| content.encrypt.key |
| content.listen.price |
| content.listen.currency |
| content.copy.price |
| content.copy.currency |
| content.home.copy.price |
| content.home.copy.currency |

FIG.  14

1500

| REQUEST |
| --- |
| request.map.pathname |
| request.access.mode |
| request.sound.quality |
| request.content.price |
| request.content.currency |
| request.CRN.node.address |
| request.CRN.username |
| request.CRN.password |
| request.CPN.node.address |
| request.CPN.product.name |
| request.CPN.product.number |
| request.CRN.node.address.transaction.number |

FIG. 15

┌─ 1600

| PERMIT |
|---|
| map.content.version |
| map.CPN.node.address.pathname.quality.level  1 |
| map.CPN.node.address.pathname.quality.level  2 |
| map.CPN.node.address.pathname.quality.level  3 |
| .  .  . |
| map.node.address.pathname.quality.level  N |
| request.content.price |
| request.content.currency |
| permit.CPN.node.address |
| permit.AN.date.time |

FIG. 16

Case 4:08-cv-01447-SBA    Document 1-2    Filed 03/13/2008    Page 19 of 28

1700

| START  REPORT |
|---|
| request.CRN.node.address.transaction.number |
| request.CRN.node.address |
| request.CRN.username |
| request.CRN.password |
| request.access.mode |
| start.report.date.time |
| content.title |
| content.artist |
| content.copyright |
| content.legal.duration |
| content.ID.code.type |
| content.ID.code.number |
| content.CPN.node.address |
| content.file.number |
| start.report.CRN.encrypt.key |
| request.content.price |
| request.content.currency |
| request.sound.quality |
| permit.map.CPN.node.address.pathname.quality.level[x] |
| start.report.CRN.timezone |
| start.report.CRN.language |
| start.report.CRN.keyboard |

FIG.  17

1800

| SUMMARY REPORT |
| --- |
| request.CRN.node.address.transaction.number |
| request.CRN.node.address |
| request.CRN.username |
| request.CRN.password |
| content.ID.code.type |
| content.ID.code.number |

## FIG. 18

1900

| ACCESS REPORT |
| --- |
| content.title |
| content.artist |
| content.copyright |
| content.legal.duration |
| content.ID.code.type |
| content.ID.code.number |
| content.CPN.node.address |
| content.file.number |
| access.territory.rightowners |
| content.price |
| content.currency |
| request.CRN.node.address.transaction.number |

## FIG. 19

2000 —

| DEBIT   REPORT |
|---|
| content.ID.code.type |
| content.ID.code.number |
| content.CPN.node.address |
| request.CPN.product.name |
| request.CPN.product.number |
| debit.date.time |
| request.CRN.username |
| request.CRN.password |
| request.content.price |
| request.content.currency |
| request.CRN.node.address.transaction.number |

FIG.  20

US 6,202,056 B1

**1**

## METHOD FOR COMPUTER NETWORK OPERATION PROVIDING BASIS FOR USAGE FEES

### FIELD OF THE INVENTION

The present invention relates to computer networks for data transfer and to monitoring use of such data for example for fee accounting for usage rights.

### BACKGROUND OF THE INVENTION

Publishers of information in digital form desire to prevent the unauthorized and unaccounted distribution or usage of electronically published materials. Electronically published materials are typically distributed in a digital form and recreated on a computer based system. Audio and video recordings, computer programs, books, and multimedia are examples of works that are suitable for publishing electronically. The sales revenue for companies in the electronic publishing and information systems industries includes payments based on an accounting for delivery of information in digital form, for example the sale of an audio CD at a retail outlet. Any unaccounted distribution of a work results in decreased revenue to the distributor and decreased royalty for the owner of usage rights in the work. For example, being able to copy an audio recording CD to another digital medium from which the audio can be retrieved and played circumvents payment for distribution from which royalty for copyright may have been due to the owner of rights in the work.

Owners of rights in electronically published works also desire to prevent the unauthorized and unaccounted distribution or usage of such materials. When records of the distribution and usage of a work are held exclusively by the distributor, falsification of records results in increased profit for the distributor and loss of royalty income for the owner of rights.

Unauthorized and unaccounted distribution can be curbed by preventing unauthorized copying of the work onto digital storage media and unauthorized transmission of the work over computer networks. Unauthorized and unaccounted usage can be curbed by preventing storage of the work for reuse or by monitoring the use of stored copies.

Existing systems and methods for preventing storage, transmission, and unmonitored use of digital works place a heavy burden of cost on the consumer desiring access to a work in digital form. The continued expansion of publication and use of works in digital form cannot remain within the policies for intellectual property protection (such as providing incentives to authors and publishers) without systems and methods for computer network operation that provide an accurate basis for usage fees.

### SUMMARY OF THE INVENTION

A system for the control of distribution and use of digital works includes a distribution and usage reporting mechanism for accurately calculating fees associated with such distribution and use. The system operates according to a method for transferring data from a content providing node to a content requesting node. The method includes the steps of: (a) transmitting a first request to the content providing node, the first request for notifying an authorizing node; (b) receiving a permit from the authorizing node in response to the notification; (c) determining a file name in response to the permit; (d) transmitting to the content providing node a second request comprising the file name; (e) transmitting to

**2**

an event reporting node a first report in response to receiving the permit; (f) receiving data from the file; and (g) transmitting to the event reporting node a second report in response to receiving the file.

By obtaining the permit without direct communication between the content requesting node and the authorizing node, manipulation of the authorizing node by the content requesting node is prevented. The content requesting node has an incentive to manipulate the authorizing node in order to receive unlimited authorization. The content providing node has an incentive to maintain proper authorization because revenues to the content providing node may be based on the number of authorized transfers.

Although a work may be identified in the request received at the content providing node, the content providing node may be prevented from obtaining information leading to the filenames that comprise the work. The content providing node may have an incentive to provide free transfers of the work for other commercial or personal use; however, by determining file name in response to the permit and preventing access to the permit from the content providing node, the content providing node cannot identify particular files that correspond to a particular work.

By transmitting reports from the content requesting node to an event reporting node, modification of data transfer reports by the content providing node is prevented. Accurate records provide basis, for example, for fees payable to owners of rights in the work.

By transmitting a first report prior to data transfer and a second report after data transfer, a duration of the usage of the data may be used as a basis, for example, for revenues to distributors and payments to owners of rights. Falsification of the duration of usage by the content requesting node is prevented.

### BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a block diagram of a network in one embodiment of the present invention.

FIG. 2 is a data flow diagram for a portion of the network of FIG. 1 that, inter alia, creates content files on a content providing node.

FIG. 3 is a data flow diagram for a portion of the network of FIG. 1 that, inter alia, satisfies a data transfer request.

FIG. 4 is a data flow diagram for a portion of the network of FIG. 1 that, inter alia, accomplishes payments, for example, to owners of rights in data transferred.

FIG. 5 is a table of outcomes for lost transmissions of reports.

FIG. 6 is a functional flow diagram for a portion of a method of validating a request by an authorizing node.

FIG. 7 is a functional flow diagram for a portion of a method of creating a permit by an authorizing node.

FIG. 8 is a functional flow diagram for a portion of a method of validating a permit by a content requesting node.

FIG. 9 is a functional flow diagram for a portion of a method of reporting, by a content requesting node, a start of data transfer.

FIGS. 10 through 12 are functional flow diagrams for portions of a method of obtaining and using content files and reporting a summary of data transfer.

FIG. 13 is a memory map of a data structure of a map file of the present invention.

FIG. 14 is a memory map of a data structure of a header of a content file of the present invention.

US 6,202,056 B1

3

FIG. 15 is a memory map of a data structure of a request of the present invention.

FIG. 16 is a memory map of a data structure of a permit of the present invention.

FIG. 17 is a memory map of a data structure of a start report of the present invention.

FIG. 18 is a memory map of a data structure of a summary report of the present invention.

FIG. 19 is a memory map of a data structure of an access report of the present invention.

FIG. 20 is a memory map of a data structure of a start report of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Data transfer in the present invention is illustrated among computer systems using a communication network. A communication network of the present invention includes at least one computer system at each of several network nodes. Each node is coupled by a link from time to time for communication with other nodes of the network. Each link includes conventional computer communication technology of the type including, for example, local area, wide area, dedicated telephone, or satellite services and including conventional data communication hardware and software. The popular computer networks known as the Internet, World Wide Web, and National Information Infrastructure are examples of such a communication network having nodes possibly at physically separate locations and addressed by a node address, for example a uniform resource locator (URL), a name from a domain name system (DNS), or an Internet Protocol address (IP).

Communication network 100 of FIG. 1 includes computer systems, each shown in a block, that communicate for data transfer. Communication of messages is illustrated by one or more lines between blocks, though it is apparent that one communication link between any two blocks is sufficient for any number of message lines. Practice of variations of the invention is independent of whether such a link is maintained continuously, as in a dedicated line, or is maintained for the duration of the message as in some public multiple access facilities.

Communication technology provides known mechanisms and computer software for message transfer. This technology surrounds the message content data with other data that provide a mechanism for various purposes including tracking messages, synchronizing equipment, and assuring accurate and secure transfer of message content data. In the description that follows, digital works are transferred between nodes. The term "content," therefore, refers to a digital work or a portion thereof.

Network 100 includes content acquisition node 102, content managing node 104, provider preparation node 106, content providing node 108, content requesting node 110, authorizing node 112, banking node 114, event reporting node 116, and reconciling node 118.

In operation, for content to be transferred on request to any of perhaps millions of content requesting nodes, the content is first received from a source and formatted for storage on one or more of perhaps thousands of content providing nodes. Initially, a content developer, publisher, or distributor provides digital works, for example multimedia files, to content acquisition node 102 for encoding in a format efficient for storage and access by content managing node 104. Content is conveyed on line 130 as it becomes

4

available for management by content managing node 104. Content from content managing node 104 is conveyed on line 132 and then made unique to each content providing node 108 by formatting processes performed by provider preparation node 106. Content providing node 108 receives content from time to time from provider preparation node 106 on line 134.

To request a data transfer in a preferred embodiment for the Internet, a user or consumer at content requesting node 110 uses a network browser, such as Microsoft Internet Explorer, and follows an Internet link (clicks on a portion of an HTML file display), causing a message in HTTP format to be conveyed on line 136 to content providing node 108. Content providing node 108 forwards the request on line 138 to authorizing node 112. If the request is valid, authorizing node 112 creates a permit and sends it on line 146 to content requesting node 110. A permit is a message created to uniquely respond to the request from a particular content requesting node. Using portions of the permit, content requesting node 110 requests on line 136 particular files from content providing node 108. In response, such particular files are conveyed on line 148 to content requesting node 110, completing the data transfer.

Accounting for the above described transfer of content includes, for example, receiving payment from the user of content requesting node 110, making payment for distribution services to at least the operator of content providing node 108, and making payment to one or more owners of rights in the content. These accounting transactions find accurate basis in a reconciliation of reports from a variety of network nodes that are reported at separate times during the data transfer process. For example, when authorizing node 112 receives the request and queries an access authority data base on content managing node 104 via lines 140 and 142, content managing node 104 logs the query and reports the log on line 156 from time to time to reconciling node 118. With knowledge of the identity of content requesting node 110, an identity of the user, and a price of the requested work for a requested purpose (for example, copy or preview), authorizing node confirms a debit of an account kept on banking node 114 by messages conveyed on line 144. Banking node 114 logs the debit and reports the log on line 154 from time to time to reconciling node 118. When the data transfer begins and again when at least some of the data has been transferred, content requesting node 110 reports on line 150 to event reporting node 116. Event reporting node 116 logs the events and from time to time reports the log on line 152 to reconciling node 118. By comparing reports received on lines 152, 154, 156, and possibly 158 (from content providing node 108), reconciling node 118 distinguishes valid complete data transfers from incomplete transfers and from events that could indicate intentional interference with the integrity of network 100. For each valid complete transfer, reconciling node 118 allocates revenues generated from the debits of users' accounts, discussed above with reference to line 144. Reconciling node 118 then initiates funds transfers with messages to banking node 114 on line 160 for payments of, for example, distribution fees and royalties.

Each node of network 100 may represent more than one conventional computer system that performs, inter alia, methods of the present invention. Multiple computers or multiple data storage devices may be necessary for maintaining a particular node's functions operational in periods of high network traffic. Such multiple computers may be at various physical locations, provided that only one network node address (for example, an IP address) is associated with each node.

US 6,202,056 B1

5

A method of the present invention for preparing content for storage on a content providing node includes separation of content and map information. When content is divided for convenience into several files in a conventional file storage system, map information identifies the particular files from the entire inventory on the storage system and the order of presentation of the files for reconstituting a particular work. Separation of content and map information facilitates security measures without unduly compromising rapid provision of a work or performance of a work on a content requesting node.

For example, as shown in FIG. 2, content acquisition node 102 encodes (using conventional data formatting and compression technology) contract items associated with the work and encodes the work itself. When the work is primarily an audio recording, contract items may additionally include: name of the album, producer, label, publisher, mail order company, publishing year, bar code, album and track distribution levels, title of a track, performers, authors, composers, ISRC code for the title, language, track number, duration, extract start and end times, number of allowed copies, price to preview (listen), price to make copy, rights collecting societies, authorized distribution areas, album cover picture, liner notes, other graphics, music style, associated country, and possibly pictures associated with the recording and text to be shown while the work is being played. Receiver processes 204 and 206 (using conventional communication and data storage technology) on content managing node 104, receive the encoded contract items and content and store each respectively on access authority data base (AADB) 208 and content masters store 210.

When a particular content providing node 108 is identified, works to be provided by that node are selected from content masters store 210 and scrambled by process 214 (using conventional data security technology). Scrambling is a preferred (though weak) form of encryption that allows some security without unduly burdening data transfer or use of the work when requested. The scrambled result of a work is combined with a header, which includes encrypted data from access authority data base 208, to form one or more content files. Content files 217 are transferred for storage on store 216 of content providing node 108.

Process 212 prepares map files 218 for transfer and storage on store 216. Descriptors of the work, of the content files, and of content providing node 108 are obtained from AADB 208 and formatted and encrypted by process 212 (using conventional data formatting and encryption technology). Some or all of the descriptors, alone or in combination, may be subject to rigorous encryption. The map file permits content file locations to be random or at least unpredictable in store 216, substantially decreasing the likelihood of unauthorized access without the system performance penalties associated with encrypting content files 218 on store 216.

In a preferred embodiment for an audio recording, the map file includes a version number of a group of content files and a node address and pathname to each content file of the group. The node address corresponds to the unique node address of the content providing node for which content files are being prepared. Each node address and pathname is encrypted separately. Each content file of the group provides a different level of sound quality for the same audio material. Different levels of quality provide, for example, flexibility in meeting the audio fidelity of different content requesting nodes. FIG. 13 illustrates an example map file data structure 1300 when instantiated in memory at provider preparation node 106. FIG. 14 illustrates an example data structure 1400

6

of a header of a content file when instantiated in memory at provider preparation node 106.

Content files 217 and map files 218 are organized for convenient access on store 216 using a conventional file system such as a directory system, shadowed physical drives, or a RAID system.

As indicated by ellipsis in FIG. 2, many content acquisition nodes may supply content to content managing node 104. Many content providing nodes may be supplied with content files from content managing node 104. Due to differing security and traffic support requirements, it is preferred to operate network 100 with physically separate nodes 104 and 106. In a variation, the functions of nodes 104 and 106 may be combined on one node or combined with content acquisition node 102.

Various methods of the present invention for data transfer use to advantage (a) the cooperation of several network nodes, (b) linking a request through a registered node, (c) creating a permit using data from multiple sources, (d) using encryption, current time of day, or encryption keys based on unique properties of a node, and/or (e) providing unique structures and separate access to content files and map files. These features, inter alia, accomplish validating the request, validating the permit, and validating the data transfer operation itself. When validation is unsuccessful, data transfer is stopped, preserving the integrity of network 100. The integrity of network 100 may be compromised by unauthorized copying, transfer, or use of a digital work.

For example, as shown in FIG. 3, a data transfer begins at content requesting node (CRN) 110. There a consumer or service user obtains a listing of titles, each title for a digital work. Process 302 (using a conventional browser and operating system) responds to user input, for example a mouse switch closure ("click") when an on-screen cursor points to a portion of an HTML page identifying a title, and in the conventional manner generates a message 303 to content providing node (CPN) 108. Process 304 (using conventional HTTP message technology) forwards the request 305 to authorizing node (AN) 112. FIG. 15 illustrates an example request data structure 1500 when instantiated in memory at authorizing node 112. In a variation, process 304 determines the price to be billed for the request type and title and includes price and price currency with the forwarded request. Price information is stored in file 306 which is available for editing by the operator of content providing node 108. In a preferred embodiment, validate payment process 310 obtains price information via the associated map file from each content file after the validity of the request has been determined.

Process 308 validates the request by denying further processing to requests that do not meet predetermined criteria. In one variation, shown in FIG. 6, process 308 includes the steps beginning at step 600. At step 602, the node address of content providing node (CPN) 108 is obtained from access authority data base (AADB) 208. At step 604, the CPN node address as provided in request 305 is compared to the CPN node address as provided from AADB 208. If a match is found, control passes to step 606, else to step 608 where the request is ignored.

At step 606, the node address of the calling page (which contains the link that was followed by process 302) is compared to the CPN node address provided by AADB 208. If a match is found, the request is considered valid and control passes to process 310, else to step 608 where the request is ignored.

Process 310 (using conventional data base and communication technology) validates payment by the user by

US 6,202,056 B1

7

confirming that the user (via pay price process 310) has made a proper debit on the user's account. If a debit cannot be confirmed, request 305 is ignored. If confirmation of the debit transaction is successful, control passes to process 312.

Process 312 creates a permit by combining information from more than one source. In one variation, shown in FIG. 7, process 312 includes the steps beginning at step 700. At step 702, a map file 315 for the requested content is obtained either from the request or from store 216 on content providing node 108. At step 704, content providing node address, content price, and price currency are obtained from request 305. At step 706, local date and time are obtained from the authorizing node 112. These data items are arranged, for example, in data structure 1600 instantiated in memory of authorizing node 112, as illustrated in FIG. 16. At step 708 some or all data in permit data structure 1600 are encrypted to provide permit 313. At step 710, permit 313 is sent to content requesting node 110.

Process 314 validates the permit by stopping the transaction for permits that do not meet predetermined criteria. In one variation, shown in FIG. 8, process 314 includes the steps beginning at step 800. At step 802, that portion of the permit that is encrypted is decrypted. At step 804, the syntax of each content file location (content.CPN.node address.pathname) is checked. The several pathnames in the permit provide ready access to the content file matching the sound quality level specified in request 305 (see FIG. 15, request.sound.quality). If the syntax check fails, control passes to step 810 to stop the transaction. Otherwise control passes to step 806 where the content requesting node address provided in permit 313 is compared to the node address of content requesting node 110. If no match, control is transferred to step 810. If a match is found, control passes to step 808, the current date and time on content requesting node 110 is compared to the date and time value stamped by authorizing node (AN) 112 on permit 313 (AN.date.time). If the current time is more than a predetermined amount (for example, 5 minutes) after AN.date.time, then control passes to step 810 and the transaction stops. Otherwise, control passes to step 812 and, in due course, to process 316.

Process 316 reports the start of a data transfer between content providing node 108 and content requesting node 110. Generation of the report may occur before data transfer actually starts or during an initial phase of data transfer. A start report is made to one or more event reporting nodes as specified by a list on content providing node 108. The report is transmitted by packet message techniques on a separate port so as to avoid interference with the data transfer itself which may be underway on another port. The two ports may share the same communication hardware such as a single line to an Internet Service Provider, as is well known in applications of TCP/IP. For other communication hardware and software configurations, concurrent ports may be arranged on two or more hardware communication links.

In one variation, shown in FIG. 9, process 316 includes the steps beginning at step 900. At step 902, one or more event reporting node addresses and the content managing node address are obtained from list 318 on content providing node 108. At step 904, a port is opened for each event reporting node on list 318. In a preferred embodiment, ports 1000 through 1016 are used, although other port numbers may be equivalently accommodated by the communication software on content requesting node 110. If no event reporting node successfully responds after attempts have been made to couple it for communication, then either the transaction is stopped or the transaction continues without the capability to generate reports. At step 906, a port is opened

8

for reporting to content managing node 104, using the next available port number from the range 1000 through 1016. At step 908, information from request 305 is obtained and placed in a data structure in memory.

FIG. 17 illustrates a start report data structure 1700 when instantiated at content requesting node 110. For data structure 1700, such data includes the content requesting node address, the username and password, and the price, currency, and specified sound quality. At step 910, data from permit 313 is added to the start report data structure. For data structure 1700, such data includes the content file location for the specified sound quality level, i.e. a corresponding content.CPN.node.address.pathname.quality.level. At step 912, data from the content file header is added to the start report data structure. For data structure 1700, such data include the title, artist, copyright, duration, ID.code.type (whether ISRC, ISWC, or etc.), the ID.code.number, the content providing node address, and a file number (a serialized number assigned by encoding process 202). At step 914, local values of the content requesting node are added to the start data structure. For data structure 1700, such values include a transaction number for discriminating reports from the same user, the current date and time, an encryption key unique to the content requesting node, and values from which the country in which content requesting node 110 is located. These later values include in one variation of the present invention, the time zone, the language identified by the operating system of node 110 and the keyboard identified by the operating system of node 110. Country location is important to allocating royalties under the laws that vary from one jurisdiction (country) to another. At step 916, the report is placed in final format using conventional techniques and at step 918 it is sent to each event reporting node, for example node 116, and to content managing node 104.

Process 320 obtains and uses the requested content files. After a content file header has been received by process 320, the transaction may be stopped if contents of the header do not compare favorably with the permit. In one variation, a summary report is prepared before data transfer of all requested files is complete. In a second variation, a duration of use of the files is measured and reported in a summary report, prepared and sent after all files have been received or usage is determined to be substantially completed. In the later case, shown in FIG. 10, process 320 includes the steps beginning at step 1000. At step 1002, a port is opened for content provider node file transfer (in addition to ports opened for reporting as discussed above). At step 1004, the header of the requested content file is obtained. The pathname to this content file is provided in permit 313 for a corresponding sound quality of content requesting node 110. After decrypting the pathname itself, at step 1006, the header of the specified content file is decrypted. At step 1008, if the content providing node address in the obtained content file header does not match the content providing node address as determined by the transaction stops at step 1010. Otherwise, control passes to step 1012.

At step 1012, the usage mode as permitted is compared to the usage mode as requested. The user specifies a usage mode at the time of picking a title for a digital work to facilitate calculation of an appropriate price. For example, in many cases, the price for previewing a work (as in listening to a portion of an audio work) is less than the price for making a copy of a work for unlimited use. If the requested and permitted usage modes both indicate a copy is to be made, that is, the data transferred will be stored for extended use, then control passes to step 1202 on FIG. 12. Otherwise, control passes to step 1102 of FIG. 11. Steps 1102 through

**9**

1108 obtain all subsequent blocks of the requested content file and, after each block is received, perform the digital work according to the data in that respective block. Unscrambling of the data may be required. Performance or preview may be, for example one or more of the following: playing audio, showing visual, performing multimedia, or executing computer program digital works. For example, when an audio file is being received, unscrambling is performed and the resulting data may be played without interruption.

At step 1110, information from several sources is combined to form a summary report. One purpose of the summary report is to indicate for purposes of reconciliation, the duration the digital work was being performed. FIG. 18 illustrates a summary report data structure 1800 when instantiated in memory at content requesting none 110. For summary report 328, data items from start report structure 1700 (having the same names) are formatted in summary report data structure 1800. At step 1112, the summary report is sent through ports opened in steps 902 and 904 to one or more event reporting nodes. The transaction is completed at step 1114.

If at step 1012, a copy of the work has been permitted, control passes to step 1202. At step 1202, a destination file for receiving the digital work is opened on the content requesting node 110. At step 1204, an encryption key is prepared using conventional data security technology. At step 1206, the content file header is obtained and written to the destination file. At steps 1208 through 1214, each block of the requested content file is obtained, encrypted, and written to the destination file. At step 1216, the destination file is closed. At step 1218 the transaction is completed.

From time to time, reports are generated by various nodes for checking the integrity of network 100 and for allocating revenues received by debiting user accounts as described with reference to FIG. 3 process 310. Five reports are provided in network 100. Access report 332 is provided by content managing node 104 from queries of AADB 208 initiated by authorizing node processes 308 through 312. FIG. 19 is a memory map of data structure 1900 of an access report record when instantiated in memory of content managing node 104 or reconciling node 118. Report 342 is provided by banking node 114 from debit transactions requested by process 310 of authorizing node 112. FIG. 20 is a memory map of a data structure of a debit report record when instantiated in memory of banking node 114 or reconciling node 118. Reports 326 and 328 respectively provide the start and summary information from content requesting node 110. Data structures 1700 and 1800 correspond to a single record of the start report and summary report respectively when instantiated in memory of reconciling node 118. Finally, report 336 describing what content files were sent and when sent may be generated by content providing node 108.

Each report consists of multiple records, each record having multiple fields. Because these reports have some fields in common, comparison of the data in identical fields ("reconciliation") provides the basis for distinguishing valid complete transactions from interrupted and unauthorized transactions. For example, an access report record 1900, debit report record 2000, start report 1700, and summary report 1800 each include a tracking field for the value: request.CRN.node.address.transaction.number. By noting whether all four records having the same value for this tracking field have been received at reconciling node 118, conclusions about network integrity and allocation of funds can be reliably made.

**10**

A method for reconciling reports of the present invention includes accommodations for high volume event report processing. In addition, reconciled reports may be used to identify nodes having suspect operations and thereby provide a way of detecting unauthorized copying and use of digital works.

In combination with the operation of the AADB 208, unauthorized use may be blocked. For example, if unauthorized transactions frequently involve the same content providing node address, that node address may be deleted from the list of registered content providing nodes by an appropriate operation on AADB 208. When a content requesting node makes a request through the link at the offending content providing node address, the request will be denied at the authorizing node.

An example of a reconciliation method of the present invention is illustrated in FIG. 4. Event reporting node 116 receives start report 326 and summary report 328 at high traffic levels from numerous content requesting nodes. Each report is logged as an event by process 402 using conventional database technology. Logged events are stored for a time in events data base 404. Synchronization of multiple parallel event reporting nodes may result in additional database transactions by event reporting node 116 as to records in events data base 404.

From time to time records from events data base 404 are provided to reconciling node 118. Process 406, using conventional data base technology, accomplishes the comparison of records having one or more respective field values that are identical. In one variation, the tracking field is used exclusively. Table 502 in FIG. 5 identifies results of reconciliation for several combinations of reports being reconciled. If for a given tracking field value (or at a given time, date, content requesting node, and content providing node), reports A 332, B 342, C 326, D 328, and possibly E 336 have been logged, then a group of messages accomplishing a normal request and payment for data transfer can be inferred to have been completed successfully. Allocation of earnings by process 408 follows the identification of such a reconciliation result.

If on the other hand, one or more of the expected reports is not timely is received for reconciliation having the given common field values, then it can be suspected that software on one or more nodes of network 100 may have been manipulated, compromising network integrity. Due to the large number of content requesting nodes and the lack of physical controls that could protect software on such nodes from being manipulated, it is likely that at least some of the failures to receive all expected reports may be a consequence of content requesting node software manipulation. In cases 508 and 510, some or all requested data transfer might have been successful; however, allocation of earnings may not be justified when there remains a possibility that a user of the respective content requesting node may insist that the debit to his account be reversed.

Allocation of earnings by process 408 is consummated by generating, according to conventional banking messaging and data base technology, requests for funds transfer by process 410 in banking node 114.

As described in detail above, network 100 overcomes the problems of the prior art and provides a basis for accurate allocation of earnings to the owners of rights in digital works stored on systems of the present invention or transferred according to methods of the present invention. These and other benefits are provided with lesser system performance penalties than heretofore possible.

US 6,202,056 B1

| 11 | 12 |

The present invention has been described in the preferred embodiments. Several variations and modification shave also been described and suggested. Other embodiments, variations, and modifications known to those skilled in the art may be implemented without departing from the scope and spirit of the invention as recited in the claims below.

What is claimed is:

1. A method for transferring data from a content providing node to a content requesting node, the method at the content requesting node comprising:

transmitting a first request to the content providing node, the first request for notifying an authorizing node;

receiving a permit from the authorizing node in response to notification from the content providing node, receiving from the authorizing node being accomplished without action by the content providing node after the permit is prepared;

determining a file identifier in response to the permit;

transmitting to the content providing node a second request comprising the file identifier; transmitting to an event reporting node a first report in response to receiving the permit;

receiving data from a file identified by the file identifier; and

transmitting to the event reporting node a second report in response to receiving data identified by the file identifier.

2. The method of claim 1 wherein the second request is transmitted in further response to receiving an acknowledgement that the first report has been received by the event reporting node.

3. The method of claim 1 wherein the second report comprises a duration of use of the data.

4. The method of claim 1 wherein the step of determining the file identifier comprises decrypting at least a portion of the permit.

5. The method of claim 1 further comprising identifying the event reporting node in response to the permit.

6. The method of claim 5 wherein the identity of the event reporting node is independent of an identity of the content providing node.

7. The method of claim 1 wherein:

(a) the content providing node comprises a map file;

(b) a portion of the permit is prepared by accessing the map file in accordance with at least a portion of the request; and

(c) the file identifier is determined in accordance with the portion of the permit.

8. A system having a data storage device having indicia of a method for managing access to a digital work, the method for execution by a first computer system, the method comprising:

transmitting via a network a first request for the digital work to a second computer system, the first request for notifying a third computer system;

receiving via the network a permit from the third computer system, the permit sent in response to notification from the second computer system, receiving from the third computer system being accomplished without action by the second computer system after the permit is prepared;

determining a file identifier in accordance with the permit;

transmitting to the second computer system a second request comprising the file identifier;

receiving from the second computer system an identifier of a fourth computer system and the digital work; and

transmitting to the fourth computer system a report in response to receiving the digital work and the identifier, wherein the permit and the report are provided for detecting unauthorized access to the digital work.

9. The system of claim 8 wherein:

the permit comprises first indicia of a network address; and

the method further comprises discontinuing performance of the method in response to comparing the first indicia and a network address of the first computer system.

10. The method of claim 8 wherein:

(a) the second computer system comprises a map file;

(b) a portion of the permit is prepared by accessing the map file in accordance with at least a portion of the request; and

(c) the file identifier is determined in accordance with the portion of the permit.

11. A method for transferring data from a content providing node to a content requesting node, the method at the content requesting node comprising:

transmitting a first request to the content providing node, the first request for notifying an authorizing node;

receiving a permit from the authorizing node in response to notification from the content providing node, receiving from the authorizing node being accomplished without action by the content providing node after the permit is prepared;

determining a file identifier in response to the permit;

transmitting to the content providing node a second request comprising the file identifier; and

receiving data from a file identified by the file identifier.

12. The method of claim 11 wherein:

(a) the permit comprises indicia of time of day;

(b) the method further comprises:

after receiving the permit, comparing the indicia of time of day to current time of day to provide a difference; and

if the difference exceeds a predetermined duration, discontinuing performance of the method prior to receiving all data from the file.

13. The method of claim 11 wherein:

(a) the permit comprises indicia of a network address; and

(b) the method further comprises discontinuing performance of the method in response to a comparison, the comparison performed in accordance with the indicia of the network address and a network address of the content requesting node.

14. The method of claim 11 further comprising transmitting to an event reporting node a first report in response to receiving the permit.

15. The method of claim 11 further comprising transmitting to a plurality of nodes a first report in response to receiving the permit.

16. The method of claim 11 wherein:

(a) the method further comprises:

transmitting to an event reporting node a first report in response to receiving the permit; and

(b) the first report is prepared in accordance with the first request and the permit.

17. The method of claim 16 wherein the first report is further prepared in accordance with at least a portion of the data identified by the file identifier.

US 6,202,056 B1

**13**

18. The method of claim 16 wherein the first report comprises a time of day.

19. The method of claim 11 wherein:

(a) the method further comprises:

transmitting to an event reporting node a first report in response to receiving the permit; and

transmitting to the event reporting node a second report in response to receiving data identified by the file identifier; and

(b) the second report is prepared in accordance with the first request and at least a portion of the data identified by the file identifier.

**14**

20. The method of claim 11 wherein the request is insufficient for identifying a node address of the authorizing node.

21. The method of claim 11 wherein:

(a) the content providing node comprises a map file;

(b) a portion of the permit is prepared by accessing the map file in accordance with at least a portion of the request;

(c) the file identifier is determined in accordance with the portion of the permit; and

(d) the request comprises indicia identifying the map file.

* * * * *

**EXHIBIT  B**



US006889206B1

(12) **United States Patent**
Nuttall

(10) **Patent No.:** **US 6,889,206 B1**
(45) **Date of Patent:** *May 3, 2005

(54) **METHOD FOR COMPUTER NETWORK OPERATION PROVIDING BASIS FOR USAGE FEES**

(75) Inventor: **Francois-Xavier Nuttall**, Prevessin (FR)

(73) Assignee: **Macrovision Corporation**, Santa Clara, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 449 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/717,614**

(22) Filed: **Nov. 21, 2000**

**Related U.S. Application Data**

(62) Division of application No. 09/055,068, filed on Apr. 3, 1998, now Pat. No. 6,202,056.

(51) **Int. Cl.**[7] ................................................. G06F 17/60
(52) **U.S. Cl.** ............................. 705/52; 705/51; 705/53; 705/54; 705/55; 705/56; 705/57; 705/58; 705/59
(58) **Field of Search** ...................................... 705/51–59

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,658,093 A | 4/1987 | Hellman | |
| 5,592,511 A | 1/1997 | Schoen et al. | |
| 5,634,012 A | 5/1997 | Stefik et al. | |
| 5,889,860 A | * 3/1999 | Eller et al. | ..................... 705/51 |
| 6,385,596 B1 | * 5/2002 | Wiser et al. | ..................... 705/51 |
| 2002/0156737 A1 | * 10/2002 | Kahn et al. | ..................... 705/51 |

FOREIGN PATENT DOCUMENTS

GB        2367925 A  *  5/2000   ............. G06F/1/00

OTHER PUBLICATIONS

Leblanc, Larry. "Song Corporation Launches Foreplay". Billboard 112, 53, 91. Dec. 30, 2000. Retrieved Feb. 23, 2004, Dialog.*

* cited by examiner

*Primary Examiner*—James P. Trammell
*Assistant Examiner*—James A. Reagan
(74) *Attorney, Agent, or Firm*—Allen J. Moss; Squire, Sanders & Dempsey L.L.P.

(57) **ABSTRACT**

A computer network having a requesting node and a providing node permits data transfer therebetween when permitted by an authorizing node. Reports generated in response to authorizations and reports generated in response to data transfers are reconciled at a reconciliation node to improve the accuracy of payments collected and paid for use of the data. Such payments include copyright royalties for audio, video, and other works recorded in digital format.

**15 Claims, 19 Drawing Sheets**





FIG. 1

Case 4:08-cv-01447-SBA    Document 1-3    Filed 03/13/2008    Page 4 of 27



FIG. 2



FIG. 3



FIG. 4

**U.S. Patent**    **May 3, 2005**    **Sheet 5 of 19**    **US 6,889,206 B1**

502

| Report | | | | | Reconciliation Result |
|---|---|---|---|---|---|
| A | B | C | D | E | |
| Y | Y | Y | Y | Y | Normal request/payment |
| Y | Y | N | N | X | Failed CRN |
| N | N | Y | X | X | Failed CRN |
| N | N | X | Y | X | Failed CRN |

504
506
508
510

Y = Yes

N = No

X = Don't Care

FIG. 5



FIG. 6

U.S. Patent          May 3, 2005          Sheet 7 of 19          US 6,889,206 B1



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11



FIG. 12

U.S. Patent       May 3, 2005       Sheet 13 of 19       US 6,889,206 B1

1300

| MAP FILE |
|---|
| map.content.version |
| map.CPN.node.address.pathname.quality.level  1 |
| map.CPN.node.address.pathname.quality.level  2 |
| map.CPN.node.address.pathname.quality.level  3 |
| .  .  . |
| map.CPN.node.address.pathname.quality.level  N |

FIG. 13

1400

| CONTENT  FILE  HEADER |
| --- |
| content.version |
| content.title |
| content.artist |
| content.copyright |
| content.date.recording |
| content.size |
| content.listen.begin |
| content.listen.duration |
| content.ID.code.type |
| content.ID.code.number |
| content.watermark.tech |
| content.legal.duration |
| content.file.number |
| content.usage.counter |
| content.CPN.node.address |
| content.generation.number |
| content.date.start.validity |
| content.date.stop.validity |
| content.encrypt.tech |
| content.encrypt.key |
| content.listen.price |
| content.listen.currency |
| content.copy.price |
| content.copy.currency |
| content.home.copy.price |
| content.home.copy.currency |

FIG.  14

1500

| REQUEST |
|---|
| request.map.pathname |
| request.access.mode |
| request.sound.quality |
| request.content.price |
| request.content.currency |
| request.CRN.node.address |
| request.CRN.username |
| request.CRN.password |
| request.CPN.node.address |
| request.CPN.product.name |
| request.CPN.product.number |
| request.CRN.node.address.transaction.number |

FIG. 15

⌐1600

| PERMIT |
|---|
| map.content.version |
| map.CPN.node.address.pathname.quality.level  1 |
| map.CPN.node.address.pathname.quality.level  2 |
| map.CPN.node.address.pathname.quality.level  3 |
| . . . |
| map.node.address.pathname.quality.level  N |
| request.content.price |
| request.content.currency |
| permit.CPN.node.address |
| permit.AN.date.time |

FIG.  16

1700

| START REPORT |
|---|
| request.CRN.node.address.transaction.number |
| request.CRN.node.address |
| request.CRN.username |
| request.CRN.password |
| request.access.mode |
| start.report.date.time |
| content.title |
| content.artist |
| content.copyright |
| content.legal.duration |
| content.ID.code.type |
| content.ID.code.number |
| content.CPN.node.address |
| content.file.number |
| start.report.CRN.encrypt.key |
| request.content.price |
| request.content.currency |
| request.sound.quality |
| permit.map.CPN.node.address.pathname.quality.level[x] |
| start.report.CRN.timezone |
| start.report.CRN.language |
| start.report.CRN.keyboard |

FIG. 17

1800

| SUMMARY  REPORT |
| --- |
| request.CRN.node.address.transaction.number |
| request.CRN.node.address |
| request.CRN.username |
| request.CRN.password |
| content.ID.code.type |
| content.ID.code.number |

FIG.  18

1900

| ⋅ACCESS  REPORT |
| --- |
| content.title |
| content.artist |
| content.copyright |
| content.legal.duration |
| content.ID.code.type |
| content.ID.code.number |
| content.CPN.node.address |
| content.file.number |
| access.territory.rightowners |
| content.price |
| content.currency |
| request.CRN.node.address.transaction.number |

FIG.  19

2000

| DEBIT· REPORT |
| --- |
| content.ID.code.type |
| content.ID.code.number |
| content.CPN.node.address |
| request.CPN.product.name |
| request.CPN.product.number |
| debit.date.time |
| request.CRN.username |
| request.CRN.password |
| request.content.price |
| request.content.currency |
| request.CRN.node.address.transaction.number |

FIG. 20

US 6,889,206 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**METHOD FOR COMPUTER NETWORK OPERATION PROVIDING BASIS FOR USAGE FEES**

This is a divisional application of U.S. patent application Ser. No. 09/055,068 filed on Apr. 3, 1998 and now U.S. Pat. No. 6,202,056 issued Mar. 13, 2001.

## FIELD OF THE INVENTION

The present invention relates to computer networks for data transfer and to monitoring use of such data for example for fee accounting for usage rights.

## BACKGROUND OF THE INVENTION

Publishers of information in digital form desire to prevent the unauthorized and unaccounted distribution or usage of electronically published materials. Electronically published materials are typically distributed in a digital form and recreated on a computer based system. Audio and video recordings, computer programs, books, and multimedia are examples of works that are suitable for publishing electronically. The sales revenue for companies in the electronic publishing and information systems industries includes payments based on an accounting for delivery of information in digital form, for example the sale of an audio CD at a retail outlet. Any unaccounted distribution of a work results in decreased revenue to the distributor and decreased royalty for the owner of usage rights in the work. For example, being able to copy an audio recording CD to another digital medium from which the audio can be retrieved and played circumvents payment for distribution from which royalty for copyright may have been due to the owner of rights in the work.

Owners of rights in electronically published works also desire to prevent the unauthorized and unaccounted distribution or usage of such materials. When records of the distribution and usage of a work are held exclusively by the distributor, falsification of records results in increased profit for the distributor and loss of royalty income for the owner of rights.

Unauthorized and unaccounted distribution can be curbed by preventing unauthorized copying of the work onto digital storage media and unauthorized transmission of the work over computer networks. Unauthorized and unaccounted usage can be curbed by preventing storage of the work for reuse or by monitoring the use of stored copies.

Existing systems and methods for preventing storage, transmission, and unmonitored use of digital works place a heavy burden of cost on the consumer desiring access to a work in digital form. The continued expansion of publication and use of works in digital form cannot remain within the policies for intellectual property protection (such as providing incentives to authors and publishers) without systems and methods for computer network operation that provide an accurate basis for usage fees.

## SUMMARY OF THE INVENTION

A system for the control of distribution and use of digital works includes a distribution and usage reporting mechanism for accurately calculating fees associated with such distribution and use. The system operates according to a method for transferring data from a content providing node to a content requesting node. The method includes the steps of: (a) transmitting a first request to the content providing node, the first request for notifying an authorizing node; (b)

receiving a permit from the authorizing node in response to the notification; (c) determining a file name in response to the permit; (d) transmitting to the content providing node a second request comprising the file name; (e) transmitting to an event reporting node a first report in response to receiving the permit; (f) receiving data from the file; and (g) transmitting to the event reporting node a second report in response to receiving the file.

By obtaining the permit without direct communication between the content requesting node and the authorizing node, manipulation of the authorizing node by the content requesting node is prevented. The content requesting node has an incentive to manipulate the authorizing node in order to receive unlimited authorization. The content providing node has an incentive to maintain proper authorization because revenues to the content providing node may be based on the number of authorized transfers.

Although a work may be identified in the request received at the content providing node, the content providing node may be prevented from obtaining information leading to the filenames that comprise the work. The content providing node may have an incentive to provide free transfers of the work for other commercial or personal use; however, by determining the file name in response to the permit and preventing access to the permit from the content providing node, the content providing node cannot identify particular files that correspond to a particular work.

By transmitting reports from the content requesting node to an event reporting node, modification of data transfer reports by the content providing node is prevented. Accurate records provide basis, for example, for fees payable to owners of rights in the work.

By transmitting a first report prior to data transfer and a second report after data transfer, a duration of the usage of the data may be used as a basis, for example, for revenues to distributors and payments to owners of rights. Falsification of the duration of usage by the content requesting node is prevented.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a block diagram of a network in one embodiment of the present invention.

FIG. 2 is a data flow diagram for a portion of the network of FIG. 1 that, inter alia, creates content files on a content providing node.

FIG. 3 is a data flow diagram for a portion of the network of FIG. 1 that, inter alia, satisfies a data transfer request.

FIG. 4 is a data flow diagram for a portion of the network of FIG. 1 that, inter alia, accomplishes payments, for example, to owners of rights in data transferred.

FIG. 5 is a table of outcomes for lost transmissions of reports.

FIG. 6 is a functional flow diagram for a portion of a method of validating a request by an authorizing node.

FIG. 7 is a functional flow diagram for a portion of a method of creating a permit by an authorizing node.

FIG. 8 is a functional flow diagram for a portion of a method of validating a permit by a content requesting node.

FIG. 9 is a functional flow diagram for a portion of a method of reporting, by a content requesting node, a start of data transfer.

FIGS. 10 through 12 are functional flow diagrams for portions of a method of obtaining and using content files and reporting a summary of data transfer.

3

FIG. 13 is a memory map of a data structure of a map file of the present invention.

FIG. 14 is a memory map of a data structure of a header of a content file of the present invention.

FIG. 15 is a memory map of a data structure of a request of the present invention.

FIG. 16 is a memory map of a data structure of a permit of the present invention.

FIG. 17 is a memory map of a data structure of a start report of the present invention.

FIG. 18 is a memory map of a data structure of a summary report of the present invention.

FIG. 19 is a memory map of a data structure of an access report of the present invention.

FIG. 20 is a memory map of a data structure of a debit report of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Data transfer in the present invention is illustrated among computer systems using a communication network. A communication network of the present invention includes at least one computer system at each of several network nodes. Each node is coupled by a link from time to time for communication with other nodes of the network. Each link includes conventional computer communication technology of the type including, for example, local area, wide area, dedicated telephone, or satellite services and including conventional data communication hardware and software. The popular computer networks known as the Internet, World Wide Web, and National Information Infrastructure are examples of such a communication network having nodes possibly at physically separate locations and addressed by a node address, for example a uniform resource locator (URL), a name from a domain name system (DNS), or an Internet Protocol address (IP).

Communication network 100 of FIG. 1 includes computer systems, each shown in a block, that communicate for data transfer. Communication of messages is illustrated by one or more lines between blocks, though it is apparent that one communication link between any two blocks is sufficient for any number of message lines. Practice of variations of the invention is independent of whether such a link is maintained continuously, as in a dedicated line, or is maintained for the duration of the message as in some public multiple access facilities.

Communication technology provides known mechanisms and computer software for message transfer. This technology surrounds the message content data with other data that provide a mechanism for various purposes including tracking messages, synchronizing equipment, and assuring accurate and secure transfer of message content data. In the description that follows, digital works are transferred between nodes. The term "content," therefore, refers to a digital work or a portion thereof.

Network 100 includes content acquisition node 102, content managing node 104, provider preparation node 106, content providing node 108, content requesting node 110, authorizing node 112, banking node 114, event reporting node 116, and reconciling node 118.

In operation, for content to be transferred on request to any of perhaps millions of content requesting nodes, the content is first received from a source and formatted for storage on one or more of perhaps thousands of content providing nodes. Initially, a content developer, publisher, or

4

distributor provides digital works, for example multimedia files, to content acquisition node 102 for encoding in a format efficient for storage and access by content managing node 104. Content is conveyed on line 130 as it becomes available for management by content managing node 104. Content from content managing node 104 is conveyed on line 132 and then made unique to each content providing node 108 by formatting processes performed by provider preparation node 106. Content providing node 108 receives content from time to time from provider preparation node 106 on line 134.

To request a data transfer in a preferred embodiment for the Internet, a user or consumer at content requesting node 110 uses a network browser, such as Microsoft Internet Explorer, and follows an Internet link (clicks on a portion of an HTML file display), causing a message in HTTP format to be conveyed on line 136 to content providing node 108. Content providing node 108 forwards the request on line 138 to authorizing node 112. If the request is valid, authorizing node 112 creates a permit and sends it on line 146 to content requesting node 110. A permit is a message created to uniquely respond to the request from a particular content requesting node. Using portions of the permit, content requesting node 110 requests on line 136 particular files from content providing node 108. In response, such particular files are conveyed on line 148 to content requesting node 110, completing the data transfer.

Accounting for the above described transfer of content includes, for example, receiving payment from the user of content requesting node 110, making payment for distribution services to at least the operator of content providing node 108, and making payment to one or more owners of rights in the content. These accounting transactions find accurate basis in a reconciliation of reports from a variety of network nodes that are reported at separate times during the data transfer process. For example, when authorizing node 112 receives the request and queries an access authority data base on content managing node 104 via lines 140 and 142, content managing node 104 logs the query and reports the log on line 156 from time to time to reconciling node 118. With knowledge of the identity of content requesting node 110, an identity of the user, and a price of the requested work for a requested purpose (for example, copy or preview), authorizing node confirms a debit of an account kept on banking node 114 by messages conveyed on line 144. Banking node 114 logs the debit and reports the log on line 154 from time to time to reconciling node 118. When the data transfer begins and again when at least some of the data has been transferred, content requesting node 110 reports on line 150 to event reporting node 116. Event reporting node 116 logs the events and from time to time reports the log on line 152 to reconciling node 118. By comparing reports received on lines 152, 154, 156, and possibly 158 (from content providing node 108), reconciling node 118 distinguishes valid complete data transfers from incomplete transfers and from events that could indicate intentional interference with the integrity of network 100. For each valid complete transfer, reconciling node 118 allocates revenues generated from the debits of users' accounts, discussed above with reference to line 144. Reconciling node 118 then initiates funds transfers with messages to banking node 114 on line 160 for payments of, for example, distribution fees and royalties.

Each node of network 100 may represent more than one conventional computer system that performs, inter alia, methods of the present invention. Multiple computers or multiple data storage devices may be necessary for main-

US 6,889,206 B1

5

taining a particular node's functions operational in periods of high network traffic. Such multiple computers may be at various physical locations, provided that only one network node address (for example, an IP address) is associated with each node.

A method of the present invention for preparing content for storage on a content providing node includes separation of content and map information. When content is divided for convenience into several files in a conventional file storage system, map information identifies the particular files from the entire inventory on the storage system and the order of presentation of the files for reconstituting a particular work. Separation of content and map information facilitates security measures without unduly compromising rapid provision of a work or performance of a work on a content requesting node.

For example, as shown in FIG. 2, content acquisition node 102 encodes (using conventional data formatting and compression technology) contract items associated with the work and encodes the work itself. When the work is primarily an audio recording, contract items may additionally include: name of the album, producer, label, publisher, mail order company, publishing year, bar code, album and track distribution levels, title of a track, performers, authors, composers, ISRC code for the title, language, track number, duration, extract start and end times, number of allowed copies, price to preview (listen), price to make copy, rights collecting societies, authorized distribution areas, album cover picture, liner notes, other graphics, music style, associated country, and possibly pictures associated with the recording and text to be shown while the work is being played. Receiver processes 204 and 206 (using conventional communication and data storage technology) on content managing node 104, receive the encoded contract items and content and store each respectively on access authority data base (AADB) 208 and content masters store 210.

When a particular content providing node 108 is identified, works to be provided by that node are selected from content masters store 210 and scrambled by process 214 (using conventional data security technology). Scrambling is a preferred (though weak) form of encryption that allows some security without unduly burdening data transfer or use of the work when requested. The scrambled result of a work is combined with a header, which includes encrypted data from access authority data base 208, to form one or more content files. Content files 217 are transferred for storage on store 216 of content providing node 108.

Process 212 prepares map files 218 for transfer and storage on store 216. Descriptors of the work, of the content files, and of content providing node 108 are obtained from AADB 208 and formatted and encrypted by process 212 (using conventional data formatting and encryption technology). Some or all of the descriptors, alone or in combination, may be subject to rigorous encryption. The map file permits content file locations to be random or at least unpredictable in store 216, substantially decreasing the likelihood of unauthorized access without the system performance penalties associated with encrypting content files 218 on store 216.

In a preferred embodiment for an audio recording, the map file includes a version number of a group of content files and a node address and pathname to each content file of the group. The node address corresponds to the unique node address of the content providing node for which content files are being prepared. Each node address and pathname is encrypted separately. Each content file of the group provides

6

a different level of sound quality for the same audio material. Different levels of quality provide, for example, flexibility in meeting the audio fidelity of different content requesting nodes. FIG. 13 illustrates an example map file data structure 1300 when instantiated in memory at provider preparation node 106. FIG. 14 illustrates an example data structure 1400 of a header of a content file when instantiated in memory at provider preparation node 106.

Content files 217 and map files 218 are organized for convenient access on store 216 using a conventional file system such as a directory system, shadowed physical drives, or a RAID system.

As indicated by ellipsis in FIG. 2, many content acquisition nodes may supply content to content managing node 104. Many content providing nodes may be supplied with content files from content managing node 104. Due to differing security and traffic support requirements, it is preferred to operate network 100 with physically separate nodes 104 and 106. In a variation, the functions of nodes 104 and 106 may be combined on one node or combined with content acquisition node 102.

Various methods of the present invention for data transfer use to advantage (a) the cooperation of several network nodes, (b) linking a request through a registered node, (c) creating a permit using data from multiple sources, (d) using encryption, current time of day, or encryption keys based on unique properties of a node, and/or (e) providing unique structures and separate access to content files and map files. These features, inter alia, accomplish validating the request, validating the permit, and validating the data transfer operation itself. When validation is unsuccessful, data transfer is stopped, preserving the integrity of network 100. The integrity of network 100 may be compromised by unauthorized copying, transfer, or use of a digital work.

For example, as shown in FIG. 3, a data transfer begins at content requesting node (CRN) 110. There a consumer or service user obtains a listing of titles, each title for a digital work. Process 302 (using a conventional browser and operating system) responds to user input, for example a mouse switch closure ("click") when an on-screen cursor points to a portion of an HTML page identifying a title, and in the conventional manner generates a message 303 to content providing node (CPN) 108. Process 304 (using conventional HTTP message technology) forwards the request 305 to authorizing node (AN) 112. FIG. 15 illustrates an example request data structure 1500 when instantiated in memory at authorizing node 112. In a variation, process 304 determines the price to be billed for the request type and title and includes price and price currency with the forwarded request. Price information is stored in file 306 which is available for editing by the operator of content providing node 108. In a preferred embodiment, validate payment process 310 obtains price information via the associated map file from each content file after the validity of the request has been determined.

Process 308 validates the request by denying further processing to requests that do not meet predetermined criteria. In one variation, shown in FIG. 6, process 308 includes the steps beginning at step 600. At step 602, the node address of content providing node (CPN) 108 is obtained from access authority data base (AADB) 208. At step 604, the CPN node address as provided in request 305 is compared to the CPN node address as provided from AADB 208. If a match is found, control passes to step 606, else to step 608 where the request is ignored. At step 606, the node address of the calling page (which contains the link that

US 6,889,206 B1

7                                                          8

was followed by process 302) is compared to the CPN node address provided by AADB 208. If a match is found, the request is considered valid and control passes to process 310, else to step 608 where the request is ignored.

Process 310 (using conventional data base and communication technology) validates payment by the user by confirming that the user (via pay price process 310) has made a proper debit on the user's account. If a debit cannot be confirmed, request 305 is ignored. If confirmation of the debit transaction is successful, control passes to process 312.

Process 312 creates a permit by combining information from more than one source. In one variation, shown in FIG. 7, process 312 includes the steps beginning at step 700. At step 702, a map file 315 for the requested content is obtained either from the request or from store 216 on content providing node 108. At step 704, content providing node address, content price, and price currency are obtained from request 305. At step 706, local date and time are obtained from the authorizing node 112. These data items are arranged, for example, in data structure 1600 instantiated in memory of authorizing node 112, as illustrated in FIG. 16. At step 708 some or all data in permit data structure 1600 are encrypted to provide permit 313. At step 710, permit 313 is sent to content requesting node 110.

Process 314 validates the permit by stopping the transaction for permits that do not meet predetermined criteria. In one variation, shown in FIG. 8, process 314 includes the steps beginning at step 800. At step 802, that portion of the permit that is encrypted is decrypted. At step 804, the syntax of each content file location (content.CPN.node address.pathname) is checked. The several pathnames in the permit provide ready access to the content file matching the sound quality level specified in request 305 (see FIG. 15, request.sound.quality). If the syntax check fails, control passes to step 810 to stop the transaction. Otherwise control passes to step 806 where the content requesting node address provided in permit 313 is compared to the node address of content requesting node 110. If no match, control is transferred to step 810. If a match is found, control passes to step 808, the current date and time on content requesting node 110 is compared to the date and time value stamped by authorizing node (AN) 112 on permit 313 (AN.date.time). If the current time is more than a predetermined amount (for example, 5 minutes) after AN.date.time, then control passes to step 810 and the transaction stops. Otherwise, control passes to step 812 and, in due course, to process 316.

Process 316 reports the start of a data transfer between content providing node 108 and content requesting node 110. Generation of the report may occur before data transfer actually starts or during an initial phase of data transfer. A start report is made to one or more event reporting nodes as specified by a list on content providing node 108. The report is transmitted by packet message techniques on a separate port so as to avoid interference with the data transfer itself which may be underway on another port. The two ports may share the same communication hardware such as a single line to an Internet Service Provider, as is well known in applications of TCP/IP. For other communication hardware and software configurations, concurrent ports may be arranged on two or more hardware communication links.

In one variation, shown in FIG. 9, process 316 includes the steps beginning, at step 900. At step 902, one or more event reporting node addresses and the content managing node, are obtained from list 318 on content providing node 108. At step 904, a port is opened for each event reporting node on list 318. In a preferred embodiment, ports 1000

through 1016 are used, although other port numbers may be equivalently accommodated by the communication software on content requesting node 110. If no event reporting node successfully responds after attempts have been made to couple it for communication, then either the transaction is stopped or the transaction continues without the capability to generate reports. At step 906, a port is opened for reporting to content managing node 104, using the next available port number from the range 1000 through 1016. At step 908, information from request 305 is obtained and placed in a data structure in memory. FIG. 17 illustrates a start report data structure 1700 when instantiated in memory at content requesting node 110. For data structure 1700, such data includes the content requesting node address, the username and password, and the price, currency, and specified sound quality. At step 910, data from permit 313 is added to the start report data structure. For data structure 1700, such data includes the content file location for the specified sound quality level, i.e. a corresponding content.CPN.node.address.pathname.quality.level. At step 912, data from the content file header is added to the start report data structure. For data structure 1700, such data include the title, artist, copyright, duration, ID.code.type (whether ISRC, ISWC, or etc.), the ID.code.number, the content providing node address, and a file number (a serialized number assigned by encoding process 202). At step 914, local values of the content requesting node are added to the start data structure. For data structure 1700, such values include a transaction number for discriminating reports from the same user, the current date and time, an encryption key unique to the content requesting node, and values from which the country in which content requesting node 110 is located. These later values include in one variation of the present invention, the time zone, the language identified by the operating system of node 110 and the keyboard identified by the operating system of node 110. Country location is important to allocating royalties under the laws that vary from one jurisdiction (country) to another. At step 916, the report is placed in final format using conventional techniques and at step 918 it is sent to each event reporting node, for example node 116, and to content managing node 104.

Process 320 obtains and uses the requested content files. After a content file header has been received by process 320, the transaction may be stopped if contents of the header do not compare favorably with the permit. In one variation, a summary report is prepared before data transfer of all requested files is complete. Further requests for files may be made in response to receiving an acknowledgement that the summary report has been received by the event reporting node. In a second variation, a duration of use of the files is measured and reported in a summary report, prepared and sent after all files have been received or usage is determined to be substantially completed. In the later case, shown in FIG. 10, process 320 includes the steps beginning at step 1000. At step 1002, a port is opened for content provider node file transfer (in addition to ports opened for reporting as discussed above). At step 1004, the header of the requested content file is obtained. The pathname to this content file is provided in permit 313 for a corresponding sound quality of content requesting node 110. After decrypting the pathname itself, at step 1006, the header of the specified content file is decrypted. At step 1008, if the content providing node address in the obtained content file header does not match the content providing node address as permitted, the transaction stops at step 1010. Otherwise, control passes to step 1012.

At step 1012, the usage mode as permitted is compared to the usage mode as requested. The user specifies a usage

US 6,889,206 B1

**9**

mode at the time of picking a title for a digital work to facilitate calculation of an appropriate price. For example, in many cases, the price for previewing a work (as in listening to a portion of an audio work) is less than the price for making a copy of a work for unlimited use. If the requested and permitted usage modes both indicate a copy is to be made, that is, the data transferred will be stored for repeated use, then control passes to step 1202 on FIG. 12. Otherwise, control passes to step 1102 of FIG. 11. Steps 1102 through 1108 obtain all subsequent blocks of the requested content file and, after each block is received, perform the digital work according to the data in that respective block. Unscrambling of the data may be required. Performance or preview may be, for example one or more of the following: playing audio, showing visual, performing multimedia, or executing computer program digital works. For example, when an audio file is being received, unscrambling is performed and the resulting data may be played without interruption.

At step 1110, information from several sources is combined to form a summary report. One purpose of the summary report is to indicate for purposes of reconciliation, the duration the digital work was being performed. FIG. 18 illustrates a summary report data structure 1800 when instantiated in memory at content requesting none 110. For summary report 328, data items from start report structure 1700 (having the same names) are formatted in summary report data structure 1800. At step 1112, the summary report is sent through ports opened in steps 902 and 904 to one or more event reporting nodes. The transaction is completed at step 1114.

If at step 1012, a copy of the work has been permitted, control passes to step 1202. At step 1202, a destination file for receiving the digital work is opened on the content requesting node 110. At step 1204, an encryption key is prepared using conventional data security technology. At step 1206, the content file header is obtained and written to the destination file. At steps 1208 through 1214, each block of the requested content file is obtained, encrypted, and written to the destination file. At step 1216, the destination file is closed. At step 1218 the transaction is completed.

From time to time, reports are generated by various nodes for checking the integrity of network 100 and for allocating revenues received by debiting user accounts as described with reference to FIG. 3 process 310. Five reports are provided in network 100. Access report 332 is provided by content managing node 104 from queries of AADB 208 initiated by authorizing node processes 308 through 312. FIG. 19 is a memory map of data structure 1900 of an access report record when instantiated in memory of content managing node 104 or reconciling node 118. Report 342 is provided by banking node 114 from debit transactions requested by process 310 of authorizing node 112. FIG. 20 is a memory map of a data structure of a debit report record when instantiated in memory of banking node 114 or reconciling node 118. Reports 326 and 328 respectively provide the start and summary information from content requesting node 110. Data structures 1700 and 1800 correspond to a single record of the start report and summary report respectively when instantiated in memory of reconciling node 118. Finally, report 336 describing what content files were sent and when sent may be generated by content providing node 108.

Each report consist of multiple records, each record having multiple fields.

Because these reports have some fields in common, comparison of the data in identical fields ("reconciliation") provides the basis for distinguishing valid complete transactions from interrupted and unauthorized transactions. For

**10**

example, an access report record 1900, debit report record 2000, start report 1700, and summary report 1800 each include a tracking field for the value: request.CRN.node.address.transaction.number. By noting whether all four records having the same value for this tracking field have been received at reconciling node 118, conclusions about network integrity and allocation of funds can be reliably made.

A method for reconciling reports of the present invention includes accommodations for high volume event report processing. In addition, reconciled reports may be used to identify nodes having suspect operations and thereby provide a way of detecting unauthorized copying and use of digital works.

In combination with the operation of the AADB 208, unauthorized use may be blocked. For example, if unauthorized transactions frequently involve the same content providing node address, that node address may be deleted from the list of registered content providing nodes by an appropriate operation on AADB 208. When a content requesting node makes a request through the link at the offending content providing node address, the request will be denied at the authorizing node.

An example of a reconciliation method of the present invention is illustrated in FIG. 4. Event reporting node 116 receives start report 326 and summary report 328 at high traffic levels from numerous content requesting nodes. Each report is logged as an event by process 402 using conventional database technology. Logged events are stored for a time in events data base 404. Synchronization of multiple parallel event reporting nodes may result in additional database improvements by event reporting node 116 as to records in events data base 404.

From time to time records from events data base 404 are provided to reconciling node 118. Process 406, using conventional data base technology, accomplishes the comparison of records having one or more respective field values that are identical. In one variation, the tracking field is used exclusively. Table 502 in FIG. 5 identifies results of reconciliation for several combinations of reports being reconciled. If for a given tracking field value (or at a given time, date, content requesting node, and content providing node), reports A 332, B 342, C 326, D 328, and possibly E 336 have been logged, then a group of messages accomplishing a normal request and payment for data transfer can be inferred to have been completed successfully. Allocation of earnings by process 408 follows the identification of such a reconciliation result.

If on the other hand, one or more of the expected reports is not timely received for reconciliation having the given common field values, then it can be suspected that software on one or more nodes of network 100 may have been manipulated, compromising network integrity. Due to the large number of content requesting nodes and the lack of physical controls that could protect software on such nodes from being manipulated, it is likely that at least some of the failures to receive all expected reports may be a consequence of content requesting node software manipulation. In cases 508 and 510, some or all requested data transfer might have been successful; however, allocation of earnings may not be justified when there remains a possibility that a user of the respective content requesting node may insist that the debit to his account be reversed.

Allocation of earnings by process 408 is consummated by generating, according to conventional banking messaging and data base technology, requests for funds transfer by process 410 in banking node 114.

As described in detail above, network 100 overcomes the problems of the prior art and provides a basis for accurate allocation of earnings to the owners of rights in digital works

US 6,889,206 B1

11

stored on systems of the present invention or transferred according to methods of the present invention. These and other benefits are provided with lesser system performance penalties than heretofore possible.

The present invention has been described in the preferred embodiments. Several variations and modification shave also been described and suggested. Other embodiments, variations, and modifications known to those skilled in the art may be implemented without departing from the scope and spirit of the invention as recited in the claims below.

What is claimed is:

1. A method for transferring data that provides pay-per-use accounting, the method comprising:

providing the data in a file to a provided content providing node, the file comprising a content identifier, the content providing node having a first node identifier;

providing on a content managing node a value for validating a request, the request conveying the first node identifier, the content identifier, and a second node identifier of a content requesting node;

validating the request in accordance with the value;

logging at the content managing node a first event in response to the request;

determining a payee identifier in accordance with the request;

forming a first report comprising the payee identifier;

logging at an event reporting node a second event in response to a second report, the second report provided in response to a permit provided by an authorizing node, provision of the permit being responsive to validating the request, the second report conveying the first node identifier, the content identifier, and the second node identifier; and

adjusting a pay-per-use account associated with the payee identifier in accordance with the first report and the second report.

2. The method of claim 1 further comprising providing a reconciliation node in communication with the event reporting node and the content managing node for performing the step of adjusting.

3. A method for managing access to a digital work, the method for execution by an authorizing node, the method comprising:

receiving via a network a request from a content providing node, the request conveying a first network address of the content providing node, a second network address of a content requesting node, and an identifier of the digital work;

obtaining from a database, in accordance with the identifier of the digital work, an authorized network address and a file identifier;

comparing the first network address and the authorized network address;

discontinuing performance of the method in response to a result of comparing the first network address and the authorized network address; and

transmitting via the network a permit to the content requesting node, the permit comprising the file identifier.

4. The method of claim 3 wherein the database is operated by a content managing node and the method further comprises transmitting via the network the permit to the content managing node.

5. The method of claim 3 wherein the request comprises a transaction identifier and the permit further comprises the transaction identifier.

12

6. The method of claim 3 wherein a plurality of file identifiers are obtained from the database and the transmitted permit further comprises the plurality of file identifiers.

7. The method of claim 3 further comprising:

determining a price in accordance with the identifier of the digital work;

seeking confirmation of a debit, the debit being in accordance with the price; and

discontinuing performance of the method on failure to receive, via the network, confirmation of the debit.

8. The method of claim 7 wherein the price is determined in further accordance with the file identifier.

9. The method of claim 7 wherein the step of seeking comprises transmitting a request for confirmation via the network to a banking node.

10. A method for creating a permit in response to receiving a request, the permit for authorizing a content providing node to provide a digital work to a content requesting node, the method performed by an authorizing node, the method comprising:

obtaining, via the network from the content providing node, indicia of file names, the digital work comprising content files corresponding to the file names;

determining a time of day at the authorizing node;

obtaining, via the network from the content providing node, a price;

forming a permit comprising a network node address of the content providing node, the indicia of file names, the time of day, and the price.

11. The method of claim 10 wherein obtaining comprises receiving a file comprising the indicia of file names.

12. The method of claim 10 wherein the price is determined from a plurality of indicia of price, each respective indicia of price being stored on the content providing node in a header of a respective file corresponding to a respective file name; and the authorizing node requests each indicia of price in accordance with each respective file name.

13. A method for managing access to a digital work, the method for execution by a first computer system, the method comprising:

receiving via a network a request from a second computer system, the request comprising a first network address of the second computer system, a second network address of a third computer system, and an identifier of the digital work;

obtaining from a database, in accordance with the identifier of the digital work, an authorized network address and a file identifier;

comparing the first network address and the authorized network address;

discontinuing performance of the method in response to a result of comparing the first network address and the authorized network address; and

transmitting via the network a permit to the content requesting node, the permit comprising the file identifier.

14. The method of claim 12 wherein the database is operated by a fourth computer system and the method further comprises transmitting via the network the permit to the fourth computer system.

15. The method of claim 12 wherein the request comprises a transaction identifier and the permit further comprises the transaction identifier.

* * * * *

**EXHIBIT D**



US006802006B1

(12) **United States Patent**
Bodrov

(10) Patent No.: **US 6,802,006 B1**
(45) Date of Patent: **Oct. 5, 2004**

(54) **SYSTEM AND METHOD OF VERIFYING THE AUTHENTICITY OF DYNAMICALLY CONNECTABLE EXECUTABLE IMAGES**

(75) Inventor: **Dmitry Bodrov**, San Diego, CA (US)

(73) Assignee: **Macrovision Corporation**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/360,297**

(22) Filed: **Jul. 22, 1999**

(51) Int. Cl.⁷ ............................ **G06F 9/78; G06F 9/36; H04L 9/00**

(52) U.S. Cl. ...................... **713/187**; 713/164; 713/167; 713/200; 713/201

(58) Field of Search ................................ 713/187, 188, 713/200, 201, 164, 165, 166, 167

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,919,545 A | | 4/1990 | Yu ............................... 380/25 |
| 5,023,907 A | | 6/1991 | Johnson et al. ................ 380/4 |
| 5,103,476 A | | 4/1992 | Waite et al. ................... 380/4 |
| 5,222,134 A | | 6/1993 | Waite et al. ................... 380/4 |
| 5,235,642 A | | 8/1993 | Wobber et al. ............... 380/25 |
| 5,319,705 A | | 6/1994 | Halter et al. .................. 380/4 |
| 5,321,841 A | | 6/1994 | East et al. ................... 395/725 |
| 5,375,240 A | | 12/1994 | Grundy ...................... 395/700 |
| 5,400,403 A | | 3/1995 | Faha et al. ................... 380/21 |
| 5,559,884 A | | 9/1996 | Davidson et al. |
| 5,572,590 A | | 11/1996 | Chess ............................. 380/4 |
| 5,692,047 A | * | 11/1997 | McManis ................... 713/167 |
| 5,757,914 A | * | 5/1998 | McManis ................... 713/187 |

| | | | |
|---|---|---|---|
| 5,940,513 A | * | 8/1999 | Aucsmith et al. ........... 713/187 |
| 5,970,145 A | * | 10/1999 | McManis .................... 713/187 |
| 6,026,293 A | * | 2/2000 | Osborn ....................... 455/411 |
| 6,070,239 A | * | 5/2000 | McManis .................... 713/187 |
| 6,189,146 B1 | * | 2/2001 | Misra et al. ................ 717/177 |
| 6,209,099 B1 | * | 3/2001 | Saunders ................... 713/200 |
| 6,253,324 B1 | * | 6/2001 | Field et al. ................ 713/187 |
| 6,307,955 B1 | * | 10/2001 | Zank et al. ................ 382/121 |
| 6,510,516 B1 | * | 1/2003 | Benson et al. ............. 713/167 |
| 6,546,487 B1 | * | 4/2003 | McManis .................... 713/169 |
| 2001/0034818 A1 | | 10/2001 | May et al. |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | 0 367 700 A3 | 12/1989 | ............. | G06F/1/00 |
| EP | 0 567 800 A1 | 2/1993 | ............. | G06F/1/00 |
| EP | 0 653 695 A2 | 2/1994 | ............. | G06F/1/00 |
| EP | 0 689 120 A1 | 6/1995 | ............. | G06F/1/00 |
| EP | 0778520 A2 | 6/1997 | | |
| WO | WO00/14631 | 3/2000 | | |

* cited by examiner

*Primary Examiner*—Ly V. Hua
(74) *Attorney, Agent, or Firm*—MacPherson Kwok Chen & Heid; David S. Park

(57) **ABSTRACT**

System and method for verifying the authenticity of executable images. The system includes a validator that determines a reference digital signature for an executable image using the contents of the executable image excluding those portions of the executable that are fixed-up by a program loader. The validator then subsequent to the loading of the executable image determines an authenticity digital signature to verify that the executable image has not been improperly modified. In addition, the validator ensures that each of the pointers in the executable image have not been improperly redirected.

**19 Claims, 6 Drawing Sheets**



Case 4:08-cv-01447-SBA    Document 1-4    Filed 03/13/2008    Page 3 of 13



FIG. 1



FIG. 2

Case 4:08-cv-01447-SBA    Document 1-4    Filed 03/13/2008    Page 5 of 13



FIG. 3

PROCESS VERSION OF EXECUTABLE IMAGE DYNAMICALLY
LINKED TO A PEER EXECUTABLE IMAGE



FIG. 4



FIG. 5



FIG. 6

US 6,802,006 B1

1

## SYSTEM AND METHOD OF VERIFYING THE AUTHENTICITY OF DYNAMICALLY CONNECTABLE EXECUTABLE IMAGES

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to computer systems. More particularly, the present invention relates to a system and method of verifying the authenticity of dynamically connectable executable images.

2. Description of the Related Technology

New object models now provide for the dynamic integration of software applications at run time. For example, Windows, an operating system licensed by Microsoft Inc., allows for the dynamic integration of a software application with a dynamic link library during the execution of the software application. Upon a user request for the execution of the software application, a program loader copies a "disk image" of the application from disk storage to main memory to create a "process image." The disk image refers to the executable image before it is loaded, whereas the process image refers to the executable image after it is loaded in memory. Both the disk image and the process image typically include a fix-up section that identifies which portions of the software need to be fixed-up to reference the dynamic link library at run time.

Significantly, after loading, the process image is different then the disk image. As such, a checksum that had been prepared with respect to the disk image would no longer match the checksum of the process image, even if the process image had not been improperly tampered with.

Therefore, there is a need for a system that can verify the identity of a software application in a dynamic loading environment. In particular, the system should be able to determine whether a software application that has been dynamically connected to another data object has been tampered with subsequent to the execution of the software application.

### SUMMARY OF THE INVENTION

One embodiment of the invention includes a system for determining the authenticity of an executable image, the system comprising an executable image having one or more pointers, and a validator capable of generating at a first point in time a reference digital signature based upon a selected content of the executable image excluding each of the pointers, wherein the validator generates an authenticity digital signature at a second point in time based upon the selected content of the executable image excluding each of the pointers, and wherein the validator determines whether the reference digital signature matches the authenticity digital signature.

Another embodiment of the invention includes a system for determining the authenticity of an executable image, the system comprising an executable image having one or more pointers and wherein the executable image includes information specifying whether each of the pointers reference locations that are within the executable image, and a validator capable of determining whether each of pointers references a respective location that is within the executable image.

Yet another embodiment of the invention includes a system for determining the authenticity of an executable image, the system comprising a first executable image, a

2

second executable image that includes a pointer that references a location within the first executable image, and a validator capable of determining whether the pointer references a location within the first executable image.

Yet another embodiment of the invention includes a system capable of determining the authenticity of an executable image, the system comprising: a first executable image, a second executable image, comprising an import table including the identifier of the first executable image and one or more external pointers, each of the external pointers referencing a location within the first executable image, and a code section containing machine code and one or more import pointers, each of the import pointers referencing a location within the import table, and a validator capable of generating at a first point in time a reference digital signature based upon a selected content of the executable image, the selected contents excluding each of the import pointers and the external pointers, wherein the validator generates an authenticity digital signature at a second point in time based upon the selected content of the executable image excluding each of the one or more pointers, wherein the validator determines whether the reference digital signature matches the authenticity digital signature, wherein the validator determines whether each of the import pointers reference a location within the first executable image, and wherein the validator determines whether the import pointer references a location within the first executable image.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a high-level block diagram illustrating a computer of the present invention that is adapted to receive an executable image from one or more sources.

FIG. 2 is a block diagram illustrating a validator that is capable of determining the authenticity of one or more executable images that reside on the computer of FIG. 1.

FIG. 3 is a block diagram illustrating the internal structure of one of the executable images of FIG. 2.

FIG. 4 is a block diagram illustrating two of the executable images of FIG. 2 being linked after a loading process.

FIG. 5 is a flowchart illustrating a process performed by the validator of FIG. 2 during an authenticity check of one of the executable images shown in FIG. 2.

FIG. 6 is a flowchart illustrating another process performed by the validator of FIG. 2 during an authenticity check of one of the executable images shown in FIG. 2.

### DETAILED DESCRIPTION OF THE INVENTION

The following detailed description is directed to certain specific embodiments of the invention. However, the invention can be embodied in a multitude of different ways as defined and covered by the claims.

System Overview

FIG. 1 is a high-level block diagram illustrating a computer 90. The computer 90 enables an authenticity check with respect to one or more executable images 100 that are executing on the computer 90.

The computer 90 may utilize any conventional general purpose single- or multi-chip microprocessor such as a Pentium® processor, a Pentium® Pro processor, a 8051 processor, a MPS® processor, a Power PC® processor, or an ALPHA® processor. In addition, the computer 90 may utilize any conventional special purpose microprocessor such as a digital signal processor or a graphics processor.

The computer 90 includes an operating system 95 and a memory 108. The operating system can be provided by any

3

operating system vendor and can include: UNIX, LINUX, Disk Operating System (DOS), OS/2, Windows 3.X, Windows 95, Windows 98, and Windows NT. For convenience of description, an embodiment of the invention with respect to Windows 95 is set forth below.

The computer **90** is in communication with one or more executable image sources **107** that provide the executable image **100** to the computer **90**. As is shown in FIG. 1, exemplary executable image providers include: a server **110**, an Internet **114**, a database **118**, a network **122**, a hardware device **126**, and/or a removable storage device **130**.

The executable image **100** is a data object that can define by itself or in conjunction with other executable images, one or more software applications. The software applications may include, for example: a word processor, a database, a digital rights management system, a personal finance utility, a graphics tool, an Internet browser, a computer game, a communications program, an authorization program, an electronic wallet, a multi-media renderer or a contract manager. Furthermore, the executable image **100** is dynamically connectable with other executable images. For example, in an embodiment of the invention that is developed for use with the Windows 95, the executable image is a dynamic link library (DLL).

The Internet **114** includes network variations such as public internet, a private internet, a secure internet, a private network, a public network, a value-added network, an intranet, and the like.

The network **122** may include any type of electronically connected group of computers including, for instance, the following networks: Intranet, Local Area Networks (LAN) or Wide Area Networks (WAN). In addition, the connectivity to the network may be, for example, remote modem, Ethernet (IEEE 802.3), Token Ring (IEEE 802.5), Fiber Distributed Datalink Interface (FDDI) or Asynchronous Transfer Mode (ATM). Note that computing devices may be desktop, server, portable, hand-held, set-top, or any other desired type of configuration. The hardware device **126** can be a logic chip, a ROM, a RAM, a smart card, or a central processing unit. The removable media storage **130** can be a floppy disk, a compact disk, a hard disk, a tape drive, a ROM, or other persistent storage medium.

FIG. 2 is a block diagram illustrating a validator **204**. In one embodiment of the invention, the validator **204** is an executable image, similar in format to the executable image **100**. In another embodiment of the invention, the validator **204** is integrated with the executable image **100**. In yet another embodiment of the invention, the validator **204** is integrated with a program loader **208**. One function of the program loader **208** is to copy an executable image **100** from the storage device **105** (FIG. 1) to the memory **108** and to bind the code and data pointers to an appropriate address prior to the execution of the executable image **100**. For convenience of description, the following description assumes that the validator **204** is a separate application that is distinct from the executable image **100** and the program loader **208**.

The validator **204** verifies the authenticity of the executable image **100** under selected conditions which are described in further detail below. As can be appreciated by the skilled technologist, the validator **204** and the program loader **208** are comprised of various sub-routines, procedures, definitional statements, and macros that are typically separately compiled and linked into a single executable program. Therefore, the following description is used for convenience to describe the functionality of the these items.

4

The validator **204** and the program loader **208** (FIG. 1) may be written in any programming language such as C, C++, BASIC, Pascal, Java, and FORTRAN. C, C++, BASIC, Pascal, Java, and FORTRAN are industry standard programming languages for which many commercial compilers and interpreters can be used to create executable code.

FIG. 2 illustrates the executable image **100** after it has been connected to an executable image **200**. It is noted that the executable image **200** can comprise the same types of data objects as described above with respect to the executable image **100**. One function of the validator **204** is to verify the authenticity of the executable images, such as executable image **100** and executable image **200**, after the executable images have been loaded into the memory **108**.

The process for verifying the authenticity of the executable images is set forth in detail with reference to FIGS. 5 and 6. However in brief, the validator **204** analyzes the executable image **100** before the executable image **100** is loaded into the memory **108** and generates a reference digital signature with respect to the executable image **100**. After the executable image **100** is loaded, the validator **204** generates an authenticity digital signature to ensure that the executable image **100** has not been tampered with. In addition, the validator **204** examines the binding between the executable image **100** and the executable image **200** to ensure that binding between the executable image **100** has not been improperly re-directed to another executable image.

FIG. 3 is a block diagram illustrating in further detail the internal structure of one embodiment of the executable image **100** that has been built as a dynamically linked library and which has been stored on the storage device **105** (FIG. 1).

The executable image **100** includes a number of sections including a header section **300**, code section **304**, a data section **308**, an import table **312**, a relocation table **316**, and an export table **321**. It is also noted that executable image **100** includes a number of pointers that are described in further detail below. However, in general, a pointer is a reference that identifies a location within the memory **108** either absolutely with respect to the memory **108** (FIG. 1) or relatively with respect to another location.

The header section **300** identifies the relative location of other sections and/or tables that are within the executable image **100**. The code section **304** includes the compiled machine code for the executable image **100**. For example, the code section **304** includes the machine instructions for the computer **90** (FIG. 1). As is shown in FIG. 3, the code section **304** includes instructions that reference other sections within the executable image **100** as well as without the executable image **1100**. As is shown by a block **320**, the code section **304** includes instructions for the assignment of the number "2" to a global variable "i". However, the actual address of the variable "i" as stored on the storage device **105** (FIG. 1) is not defined in the memory **108** since the executable image **100** has not yet been loaded into the memory **108** (FIG. 1). Furthermore, the code section **304** includes an instruction to call a function foo( ). The call to the procedure foo( ) includes an import pointer which references a location within the import table **312**.

The data section **308** is used to store the contents of any global variables that are identified in the code section **304**. The import table **312** includes various items of information to assist the program loader **208** (FIG. 2) in connecting the executable image **100** to another executable image. The import table **312** includes: an identifier, such as a name, for each of the procedures that are maintained;,by other execut-

US 6,802,006 B1

5

able images, the name of the executable image, and one or more external pointers which reference the addresses of externally maintained procedures. The import table 312, as is stored on the storage device 105 (FIG. 1), does not yet reference the memory address of the procedure foo( ).

The relocation table 316 identifies the position of each of the portions of the code section 304 that are in need of "fixing-up" upon the loading of the executable image 100. The term fixing-up as used herein refers to the process of modifying the executable image 100 in memory such that any unresolved pointers reference the appropriate data and/ or code locations. After a pointer has been fixed-up by the program loader 208, it is said to be "bound" to a selected address.

The export table 321 identifies each of the procedures that are made publicly available by the executable image 100. It is noted that the executable image 100 can include other information such as debug information or other tables to assist with the loading and/or linking process.

The validator 204 (FIG. 2) determines a reference digital signature with respect to the executable image 100 as it is stored on the storage device 105. The process for generating the reference signature is described in further detail with respect to FIG. 6. In one embodiment of the invention, the validator 204 determines the reference digital signature with respect to the entire executable image 100 excluding any pointers that are in need of fixing up by the program loader 208 (FIG. 2). In another embodiment of the invention, the validator 204 determines a reference digital signature with respect to selected sections, such as the code section 304 and/or the import table 312 of the executable image 100 excluding any of the addresses that are in need of fixing up by the program loader 208.

FIG. 4 is a block diagram illustrating the executable image 100 after it is has been fixed-up with respect to the executable image 200. As can be seen by inspection of FIG. 4, a data pointer for the variable "i" has been bound to an address in the data section 308 according to the fix-up information contained within the relocation table 316. Further, an external pointer in the import table 312 has been bound to an export table in the executable image 200. An export pointer at the referenced address in the export table of the second executable image 200 has been bound to the actual location of the procedure foo( ) that resides within the executable image 200.

After being fixed-up, the validator 204 (FIG. 2) performs various authenticity checks with respect to the executable image 100. Each of these authenticity checks are described in further detail with respect to FIGS. 5 and 6. However, in summary, the validator 204 performs the following described functions.

First, the validator 204 determines an authenticity digital signature with respect to the same addresses that were used to generate the reference digital signature. If the authenticity digital signature differs from the reference digital signature, the validator 204 (FIG. 2) assumes that the executable image 100 has been tampered with.

Second, the validator 204 examines each of the bindings in the import table 312 to ensure the addresses which are referenced by the import table have not been tampered with. If the import table 312 is improperly modified, a procedure call to a selected function could be rerouted to an untrusted routine other than the routine intended by the provider of the executable image 100. Such an untrusted routine could accidentally or deliberately return false or other injurious data to the executable image 100.

FIG. 5 is a flowchart illustrating a process for verifying the authenticity of the executable image 100. Starting at a

6

state 600, the validator 204 (FIG. 2) receives a request for determining the authenticity of the executable module 100 (FIG. 1). In one embodiment of the invention, the request is generated by the program loader 208 In another embodiment of the invention, the request is generated by the operating system 95 (FIG. 1). In yet another embodiment of the invention, the request is generated by an executable image (not shown) executing on the computer 90. (FIG. 1). In yet another embodiment of the invention, the request is generated by a routine in the validator 204.

Continuing to a state 604, the validator 204 (FIG. 2) identifies each of the pointers within the executable image 100 that are in need of fixing-up. In one embodiment of the invention, if the authenticity of only selected sections in the executable image 100 are to be determined, the validator 204 identifies only those pointers that fall within the selected sections of the executable image 100. For example, the validator 204 can be configured to identify only those pointers that fall within the code section 304 (FIG. 3) or the import table 312 (FIG. 3).

In one embodiment of the invention, the validator 204 parses the relocation table 316 to identify each of these pointers (FIG. 3). As discussed above with reference to FIG. 3, the relocation table 316 identifies the location of an address relative to the base of the executable image 100. By examining the relocation table 316, the validator 204 can identify which portions of code section 304 are modified by the program loader 208 during loading.

Continuing to a state 608, the validator 204 (FIG. 2) generates a reference digital signature with respect to the executable image 100 (FIG. 1). A digital signature as used herein is defined to include any methodology for identifying the contents of a selected set of data. In its simplest form, a digital signature can include a complete copy of the selected set of data that is to be signed. However, the digital signature can also include the results of a hashing function that has been applied to the selected set of data. Further, a digital signature can be a digital certificate. It is to be appreciated by the skilled technologist that one of any of a number of standard hashing functions may be used to generate the reference digital signature.

Still referring to the state 608, in one embodiment of the invention, the validator 204 determines the reference digital signature based upon the contents of the entire executable image 100 excluding any addresses that are in need of fixing-up by the program loader 208 (FIG. 2). In another embodiment of the invention, the validator 204 determines a reference digital signature based upon the content of selected sections, such as the code section 304 and/or the import table 312 excluding any of the addresses that are in need of fixing-up by the program loader 208.

Proceeding to a state 612, the validator 204 (FIG. 2) stores the reference digital signature for later retrieval. In one embodiment of the invention, the validator 204 stores the reference digital signature in the storage device 105 (FIG. 1). In another embodiment of the invention, the validator 204 stores the reference digital signature in a selected section of the executable image 100, such as a resource table (not shown). In yet another embodiment of the invention, the reference digital signature is appended to the executable image 100. In yet another embodiment of the invention, the reference digital signature is stored in a database, a web server, or on the network 122 (FIG. 1). In yet another embodiment of the invention, the reference digital signature is created before the executable image 100 is provided to the computer 90. In this embodiment, the reference digital signature can be generated in any of the above described ways.

US 6,802,006 B1

7

Next, at a state 614, the validator 204 (FIG. 2) determines an authenticity signature of the executable image 100 after or before the executable image 100 has been loaded by the program loader 208 into the memory 108 (FIG. 2). At this step, the validator 204 reapplies the hashing function that was applied by the validator 204 during the state 608. The validator 204 can be configured to determine the authenticity digital signature upon the occurrence of one or more selected conditions, such as: the expiration of a timer, an authenticity self test of the executable image 100, an idle time of the computer 90 (FIG. 1), or upon a request of the executable image 100.

Continuing to a decision state 618, the validator 204 (FIG. 2) determines whether the reference digital signature (generated in the state 608) matches the authenticity digital signature (generated in the state 614). If the reference digital signature does not match the authenticity digital signature, the validator 204 proceeds to a state 622, wherein the validator 204 initiates a security alert. At the state 622, the validator 204 may perform a plurality of functions such as: unload the executable image 100, load a new copy of the executable image 100 from the storage 105 (FIG. 1) to the memory 108 (FIG. 1), load a new version of the executable image 100 from the network 122, delete the executable image 100 from the storage 105, display a warning to a user residing at the computer 90 (FIG. 1), transmit an error message to a remote computer (not shown) via the network 122, or undo one or more actions performed by the executable image 100.

Referring again to the decision state 618, if the validator 204 (FIG. 2) determines that the reference digital signature matches the authenticity digital signature, the validator 204 proceeds to an end state 624. Depending on the embodiment, the validator 204 (FIG. 2) may return to the state 614 to re-determine the authenticity digital signature upon the occurrence of the selected conditions.

FIG. 6 is a flowchart illustrating another process performed by the validator 204 of FIG. 2 during an authenticity check of one of the executable images shown in FIG. 2. The process performed by FIG. 6 is distinct from the process performed by FIG. 5 and can be performed in isolation or in conjunction with the processes performed by FIG. 5. In particular, FIG. 6 illustrates a process for verifying that each of the pointers in the executable image are bound to a proper location. The following text describes an authenticity check process with respect to import pointers in the code section 304 and export pointers in the import table 312 of the executable image 100. However, it is to be appreciated by the skilled technologist, that a similar process can be employed with respect to other types of pointers in the executable image 100.

Starting at a state 700, the validator 204 (FIG. 2) receives a request from a requestor for determining the authenticity of the executable module 100 (FIG. 1). In one embodiment of the invention, the requestor is the program loader 208 (FIG. 2). In another embodiment of the invention, the requestor is the operating system 95 (FIG. 1). In yet another embodiment of the invention, the requestor is an executable image (not shown) executing on the computer 90 (FIG. 1). In yet another embodiment of the invention, the requester is a routine within the validator 204. Further, the request can be initiated by one of the requesters upon the occurrence of one or more selected conditions which include: the expiration of a timer, the detection of an idle time with respect to the computer 90 (FIG. 1), and/or before the execution of a critical action, such as a bank transaction.

Continuing to a state 704, the validator 204 (FIG. 2) identifies each of the import pointers in the code section 304.

8

In one embodiment of the invention, the validator 204 parses the relocation table 316 to identify each of these import pointers (FIG. 3).

Next, at a state 708, the validator 204 (FIG. 2) examines each of the import pointers in the code section 320 to determine whether each of the import pointers are bound to locations that are within the import table 312. At this state, in one embodiment of the invention, the validator 204 reads the header 300 to determine the begin and end address of the import table 312.

If each of the import pointers are not bound to a location that is within the import table 312 (FIG. 3), the validator 204 (FIG. 2) proceeds to a state 714 wherein the validator 204 initiates a security alert. At the state 714, the validator 204 may perform a plurality of functions such as: unload the executable image 100, load a new copy of the executable image 100 from the storage 105 (FIG. 1), to the memory 108 (FIG. 1), load a new copy of the import image 100, delete the executable image 100 from the storage 105, display a warning to a user residing at the computer 90 (FIG. 1), transmit an error message to a remote computer (not shown) via the network 122, or undo one or more actions performed by the executable image 100. The process flow moves to an end state 715 and ends.

Referring again to the decision state 712, if the validator 204 (FIG. 2) determines that each of the import pointers within the code section. 304 are bound to the import table 312 (FIG. 3), the validator 204 proceeds to a state 716. At the state 716, the validator 204 identifies each of the external pointers in the import table 312.

Proceeding to a state 720, the validator 204 (FIG. 2) determines the binding locations of the external pointers in the import table 312 (FIG. 2). In one embodiment of the invention, the validator 204 stores the binding locations in an external pointer table (not shown) which is maintained by the validator 204.

Continuing to a decision state 722, the validator 204 determines whether the binding locations of the external pointers reside within one of the executable images identified by the import table 312 (FIG. 2). For convenience of description, the executable images identified by the import table 312 are collectively referred to as the exporting executable images.

In one embodiment of the invention, the validator 204 calls the operating system 95 (FIG. 1) to determine the locations of the exporting executable images within the memory 108 (FIG. 1). For example, Windows 95 provides a procedure call named "GetModuleHandle( )" which returns the base address of an executable image given the name of the executable image. Using the base address, the validator 204 can identify locations of the header as well as the other sections of the exporting executable images.

Still referring to the state 722, if the validator 204 determines that each of the external pointers are not bound to the exporting executable images, the validator 204 proceeds to the state 714 which is described in further detail above. However, if the validator 204 determines that each of the external pointers are bound to the exporting executable images, the validator 204 proceeds to the end state 715 and ends.

Advantageously, the present invention allows for static, dynamic, and run-time verification of the authenticity of executable images and does not require changes to either the source or the object code of an executable image. The present invention ensures that an executable image is authentic and has not been tampered with after it has loaded. After a reference digital signature is determined, the vali-

US 6,802,006 B1

9

dator 204 can subsequently generate an authenticity digital signature to ensure that the data object has not been modified. Further, the validator 204 can determine whether each of the pointers in the executable image have been bound to a correct location.

For example, with respect to a data pointer in the code section 304, the validator 204 can check the relocation table 316 to ensure that the data pointer references a location within the data section 308. Further, for example, with respect to an external pointer in the import table 312, the validator 204 can ensure that the external pointer references a trusted executable image, the name of which is included in the import table 312. Since the name of the executable image is not modified by the program loader 208 (FIG. 2), the validator 204 can ensure as well that the name of a trusted executable image has not changed by the use the reference and authenticity digital signatures.

While the above detailed description has shown, described, and pointed out novel features of the invention as applied to various embodiments, it will be understood that various omissions, substitutions, and changes in the form and details of the device or process illustrated may be made by those skilled in the art without departing from the spirit of the invention. The scope of the invention is indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

What is claimed is:

1. A system for determining the authenticity of an executable image, the system comprising:

an executable image having one or more pointers that are in need of fixing up by a program loader; and

a validator capable of generating at a first point in time a reference digital signature based upon a selected content of the executable image excluding each of the pointers, wherein the validator generates an authenticity digital signature at a second point in time based upon the selected content of the executable image excluding each of the pointers, and wherein the validator determines whether the reference digital signature matches the authenticity digital signature.

2. The system of claim 1, wherein the reference digital signature is stored within the executable image.

3. The system of claim 1, wherein the reference digital signature is stored on a network.

4. The system of claim 1, wherein the reference digital signature is stored in a database.

5. The system of claim 1, wherein the reference digital signature is stored in the validator.

6. The system of claim 1, wherein the first point in time is prior to the executable image being processed by the program loader and wherein the second point in time is subsequent to the executable image being processed by the program loader.

7. The system of claim 1, wherein the first point in time is prior to the executable image being processed by the

10

program loader and wherein the second point in time is prior to the executable image being processed by the program loader.

8. The system of claim 1, wherein the first point in time is subsequent to the executable image being processed by the program loader and wherein the second point in time is subsequent to the executable image being processed by the program loader.

9. The system of claim 1, wherein the validator generates a warning upon the determination that the reference digital signature does not match the authenticity digital signature.

10. The system of claim 1, wherein the validator generates a warning to a source of the executable image upon the determination that the reference digital signature does not match the authenticity digital signature.

11. The system of claim 1, wherein the validator generates a warning to a source of the validator upon the determination that the reference digital signature does not match the authenticity digital signature.

12. The system of claim 1, wherein the selected content comprises a code section and one or more of the pointers that reference an import table that is in the executable image.

13. The system of claim 1, wherein the selected content comprises an import table and one or more of the pointers that reference an address in another executable image.

14. A method of determining the authenticity of an executable image, the method comprising:

identifying one or more locations within the executable image, each of the identified locations being modified by a program loader;

generating a reference digital signature based upon a selected content of the executable image excluding the one or more identified locations;

generating an authenticity digital signature based upon the selected content of the executable image excluding the one or more identified locations; and

determining whether the authenticity digital signature matches the reference digital signature.

15. The method of claim 14, additionally comprising generating a warning upon the determination that the authenticity digital signature does not match the reference digital signature.

16. The method of claim 14, additionally comprising generating a warning to a provider of the executable image upon the determination that the authenticity digital signature does not match the reference digital signature.

17. The method of claim 14, wherein the selected content includes the entire executable image.

18. The method of claim 14, wherein the selected content comprises a section of machine code.

19. The method of claim 14, wherein the selected content comprises an import table that resides in the executable image.

* * * * *

**EXHIBIT E**

US006510516B1

(12) **United States Patent**      (10) **Patent No.:**      **US 6,510,516 B1**
Benson et al.                      (45) **Date of Patent:**      **Jan. 21, 2003**

(54) **SYSTEM AND METHOD FOR AUTHENTICATING PEER COMPONENTS**

(75) Inventors: **Greg Benson**, San Diego, CA (US); **Martin Franklin**, San Diego, CA (US); **Christopher L. Knauft**, San Diego, CA (US)

(73) Assignee: **Macrovision Corporation**, Sunnyvale, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/231,140**

(22) Filed: **Jan. 15, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/071,737, filed on Jan. 16, 1998.

(51) Int. Cl.[7] ............................ H04L 9/00; G06T 15/70
(52) U.S. Cl. ........................................ 713/167; 345/474
(58) Field of Search ................................ 713/167, 168, 713/176, 155, 156, 185; 705/51, 64, 65, 67, 75; 345/473, 474

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,919,545 A | 4/1990 | Yu | 380/25 |
| 5,023,907 A | 6/1991 | Johnson et al. | 380/4 |
| 5,103,476 A | 4/1992 | Waite et al. | 380/49 |
| 5,222,134 A | 6/1993 | Waite et al. | 380/25 |
| 5,235,642 A | 8/1993 | Wobber et al. | 380/25 |
| 5,319,705 A | 6/1994 | Halter et al. | 380/4 |
| 5,321,841 A | 6/1994 | East et al. | 395/725 |
| 5,375,240 A | 12/1994 | Grundy | 395/700 |
| 5,400,403 A | 3/1995 | Fahn et al. | 380/21 |
| 5,559,884 A | 9/1996 | Davidson et al. | |
| 5,572,590 A | 11/1996 | Chess | 380/4 |

| | | | |
|---|---|---|---|
| 5,982,390 A | * 11/1999 | Stoneking et al. | 345/474 |
| 6,289,320 B1 | * 9/2001 | Drummond et al. | 705/35 |
| 6,317,868 B1 | * 11/2001 | Grimm et al. | 709/225 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | 0 367 700 A3 | 12/1989 | | G06F/1/00 |
| EP | 0 567 800 A1 | 2/1993 | | G06F/1/00 |
| EP | 0 653 695 A2 | 2/1994 | | G06F/1/00 |
| EP | 0 689 120 A1 | 6/1995 | | G06F/1/00 |
| EP | 0778520 A2 | 6/1997 | | |
| WO | WO00/14631 | 3/2000 | | |

OTHER PUBLICATIONS

"Virus Checker Integrated in Web Explorers and File Transfer Protocol Utilities" IBM Technical Disclosure Bulletin, vol. 39, No. 1, Jan. 1996, p. 193.

* cited by examiner

*Primary Examiner*—Matthew Smithers
(74) *Attorney, Agent, or Firm*—MacPherson Kwok Chen & Heid LLP

(57) **ABSTRACT**

A system and method for controlling the usage of data objects in component object systems. According to the invention, each data object includes a peer list that defines one or more peer data objects that are required by the data object. Upon receipt of a data object, the system verifies the integrity of the data object. Further, the system identifies the integrity of the peer data objects. If the system cannot find the peer data objects, or the system cannot authenticate the peer data objects, the system may optionally retrieve a peer data object that can be authenticated from a data object depository. In addition to validating the integrity of the data object, the system verifies that the data object is authorized to communicate with each of the peer data objects. Further, the system verifies that the peer data objects are authorized to communicate with the data object.

**32 Claims, 10 Drawing Sheets**





FIG. 1



*FIG. 2*



FIG. 3



*FIG. 4*



*FIG. 5*



*206*

WIRING DATA FIELD

LISTENER *500*

SOURCE *502*

ADD METHOD *504*

REMOVE METHOD *506*

SOURCE INDICATOR *508*

*FIG. 6*



_206_

_510_

301. Preemption with respect to other laws1
(a) On and after January 1, 1978, all legal or
equitable rights that are equivalent to any of the
exclusive rights within the general scope of
copyright as specified by section 106 in works of
authorship that are fixed in a tangible medium of
expression and come within the subject matter of
copyright as specified by sections 102 and 103,
whether created before or after that date and
whether published or unpublished, are governed
exclusively by this title. Thereafter, no person is
entitled to any such right or equivalent right in any
such work under the common law or statutes of
any State.

DATA
SUBCOMPONENT

_FIG. 7_

*206*

```
import java.io.";
public class Count{
    public static void countChars(Reader in) throws
IOException
    {
        int count=0;


        while (in.read() !=−1
            count++;
        System.out.printin("Counted" + count +"
chars.");
    }
    // ... main method omitted ...
}
```

CODE DATA FIELD

*FIG. 8*



*FIG. 9*



FIG. 10

US 6,510,516 B1

1

## SYSTEM AND METHOD FOR AUTHENTICATING PEER COMPONENTS

### RELATED APPLICATIONS

This application claims the benefit of and incorporates by reference U.S. Provisional Application No. 60/071,737, filed on Jan. 16, 1998.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention pertains to the field of data management. More particularly, the invention pertains to a system and method for authenticating peer data objects in component object systems.

2. Description of the Related Technology

Historically, software applications were designed like warehouses that were used to support factories prior to the advent of just-in-time (JIT) manufacturing. Before JIT manufacturing, warehouses were stored with every part without regard to when the part would be needed or whether the part would be needed at all. Similarly, software applications have traditionally been built using a plurality of modules that are stored in the software application, regardless of whether all of the modules may be needed. One technological problem in developing an object based solution is that software code is typically compiled and linked into an executable program. Once the code is in an executable state, integrating further components into the program is difficult.

However, new object models now provide for the dynamic integration of data objects into a working application. For example, Internet browsers, using an interpretive environment, allow for the dynamic integration of various data objects, such as a Java applet, into the Internet browser.

Although data objects according to current object models contain some limited one-way security features, there is currently no way for the data object to authenticate the identity of the browser and for the browser to authenticate the identity of the data object. At most, data objects are designed with a simple security scheme in which the browser can decide whether or not to trust the data object. If the data object is trusted, the data object is granted access to certain system features. Otherwise, if the data object is not trusted, the data object is given limited access to system features.

Moreover, using current technology, data objects cannot verify the identity of the browser or other data objects that may have been installed in the browser. Due to this limitation, secure and protected data objects cannot be developed since they cannot guarantee that the target environment will recognize and understand their internal security.

Therefore, there is a need for a system that can authenticate the identity of a data object to its peers each time the data object is used. In addition, the system should be able to authenticate the identity of the peers to the data object. After the data object and the peer data objects are identified, the data object should be able to dynamically connect with the peer data objects. Also, if the data object needs a selected peer data object, and if the selected peer data object cannot be found on the system or the peer data object cannot be authenticated, the system should be able to retrieve a peer data object that can be authenticated.

### SUMMARY OF THE INVENTION

The animating system of the present invention has several features, no single one of which is solely responsible for its desirable attributes. Without limiting the scope of this invention as expressed by the claims which follow, its more prominent features will now be summarized.

One embodiment of the invention includes a method of controlling the usage of data in a computer having one or more peer data objects, the method comprising providing a data object, the data object including a description of one or more of the peer data, determining whether the peer data objects are authorized to communicate with the data object, determining whether the data object is authorized to communicate with the peer data objects, and connecting the data object to the peer data objects based upon authorization being granted such that the data object can communicate with the peer data objects and the peer data objects can communicate with the data object.

Another embodiment of the invention includes a system for controlling the usage of a data object, the system comprising one or more peer data objects, the peer data objects collectively defining a software application, a parser capable of reading from a data object a description of one or more peer data objects that are required for use of the data object, a validate data object module capable of determining whether the data object is authorized to communicate with one or more peer data objects, a validate peer module capable of determining whether the peer data objects are authorized to communicate with the data object, and a wiring module capable of controlling the connection of the peer data objects to the data object.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a high-level block diagram illustrating a plurality of data object providers, a data object, and an animating system of the present invention that connects the data object to one or more peer data objects.

FIG. 2 is a block diagram illustrating a number of the modules that comprise the animating system shown in FIG. 1.

FIG. 3 is a block diagram illustrating the components of the data object that is shown in FIG. 1, the components including: a digital object identifier, a peer list, a signature list, management information, one or more subcomponents, and an export list.

FIG. 4 is a block diagram illustrating the elements of one of the subcomponents that are shown in FIG. 3.

FIG. 5 is a block diagram illustrating the elements of the export list that is shown in FIG. 3.

FIG. 6 is a block diagram illustrating a wiring data field that is contained in selected subcomponents that are shown in FIG. 3.

FIG. 7 is a block diagram illustrating exemplary data that may be contained in the subcomponents that are shown in FIG. 3.

FIG. 8 is a block diagram illustrating exemplary code that may be contained in the subcomponents that are shown in FIG. 3.

FIG. 9 is a flowchart illustrating a process for creating the data object that is shown in FIG. 3.

FIG. 10 is a flowchart illustrating a process for connecting the data objects with the peer data objects shown in FIG. 1.

### DETAILED DESCRIPTION OF EMBODIMENTS OF THE INVENTION

The following detailed description is directed to certain specific embodiments of the invention. However, the inven-

US 6,510,516 B1

**3**

tion can be embodied in a multitude of different ways as defined and covered by the claims.

System Overview

FIG. 1 is a high-level block diagram illustrating an animating system 100 of the present invention. The animating system 100 enables the authentication and connection of a data object 112 to one or more peer data objects or components 118 in a secure and protected environment. Subsequent to authentication and assuming that data object 112 is authorized to communicate with the peer data objects 118, the animating system 100 coordinates the connection of the data object 112 with the peer data objects 118.

As shown in FIG. 1, the animating system 100 may communicate with one or more data object providers 107 that contain the data object 112. An exemplary data object providers may be one of the following: a database 104, a server computer 106, a removable media storage 110, or a hardware device 111. The removable media storage 110 can be a floppy disk, a compact disk, a hard disk, a tape drive, a ROM, or other persistent storage medium. The hardware device 111 can be a logic chip, a ROM, a RAM, a smart card, or a central processing unit.

In one embodiment of the invention, the data object 112 may be maintained in a Java Archive (JAR) file. JAR is a platform-independent file format that aggregates many files into one. Using the JAR file format, multiple Java applets and their requisite components can be grouped together in a single file thereby facilitating the transfer of the applets between computers. Additional information regarding JAR files is located in Jar Guide published by Sun Microsystems, Inc. of Mountainview, Calif., and which is hereby incorporated by reference. In another embodiment of the invention, the data object 112 is a hardware device.

It is noted that each of the peer data objects 118 is a data object as defined herein with the term peer merely distinguishing its role. The schema of the data object 112 and the peer data objects 118 is set forth below with reference to FIG. 3.

The peer data objects 118 can define together, or in isolation, one or more software applications. The software applications may include, for example, a word processor, a database, a personal finance utility, a graphics tool, an Internet browser, a computer game, a communications program, an authorization program, an electronic wallet, a multi-media renderer or a contract manager. A process for using the peer data objects is set forth below with reference to FIG. 10.

In one embodiment of the invention, the animating system 100 is an executable computer program that resides on a client computer 102. The animating system 100 includes various modules that are typically separately compiled and linked into a single executable program. The modules of the animating system 100 are described below with reference to FIG. 6.

The animating system 100 (FIG. 1) may be written in any programming language such as C, C++, BASIC, Pascal, Java, and FORTRAN. C, C++, BASIC, Pascal, Java, and FORTRAN are industry standard programming languages for which many commercial compilers and interpreters can be used to create executable code. Further, the animating system 100 may be used in connection with various operating systems such as, for example, UNIX, Solaris, Disk Operating System (DOS), OS/2, Windows 3.X, Windows 95, Windows 98, Windows CE, Palm Pilot OS, and Windows NT.

**4**

The client computer 102 may be any conventional general purpose computer using one or more microprocessors, such as, for example, a Pentium processor, a Pentium II processor, a Pentium Pro processor, an xx86 processor, an 8051 processor, a MIPS processor, a Power PC processor, or an Alpha processor. Additionally, the client computer 102 may be a specialized computer, such as a handheld computer, a telephone, a router, a satellite, a smart card, an embedded computing device, or a network of computing devices.

FIG. 2 is a block diagram illustrating the components of the animating system 100 (FIG. 1). The animating system 100 includes a parser 150 for reading the data object 112. The animating system 100 also includes a validation module 152. The validation module 152 includes two subcomponents, namely, a validate data object module 158 and a validate peer module 160. The validate data object module 158 is configured to verify the integrity of the data object 112 (FIG. 1) before the data object is connected to the peer data objects 118 (FIG. 1). The validate peer module 160 is used to validate the integrity of each of the peer data objects 118.

The animating system 100 also includes a wiring module 154 that communicates with the validation module 152. The wiring module 154 reads the data object 112 to determine which peer data objects and/or hardware configuration are needed by the data object for proper operation. The process for connecting the data component with the peer data components is set forth below with reference to FIG. 10.

In addition, the animating system 100 includes an event manager 156. The event manager is responsible for sending events to the data object 112 prior to the data object 112 being connected to the peer data objects 118 (FIG. 1) and afterwards.

FIG. 3 is a diagram that illustrates the constituent parts of the data object 112. The data object 112 includes a digital object identifier 200 that uniquely identifies the data object. The digital object identifier can be generated according to any standard or proprietary identification schema. Additional information regarding an exemplary digital object identification framework is described in About the DOI published by the International Digital Object Identifier Foundation and which is hereby incorporated by reference.

The data object 112 also includes a peer list 202 (FIG. 3). The peer list 202 defines all of the peer data objects, such as are shown in FIG. 1, that are needed by the data object 212 for proper operation. In one embodiment of the invention, the peer list 202 is a linked list of peer list structures (not shown), each of the peer list structures representing one of the peer data objects 118. Each of the peer list structures contain the name of a peer data object, a version number that is associated with the peer data object, and a location identifier. The location identifier designates a location where the peer data object may be retrieved, if the data object is not stored on the client computer 102. In one embodiment of the invention, the location identifier is a Universal Resource Locator (URL) that designates a website. Alternatively, the location identifier may identify the database 104.

Optionally, the peer list 202 may include a description of a decryption data object (not shown) that is responsible for decrypting the contents of the subcomponents of the data object 112.

The data object 112 also includes a signature list 204 (FIG. 3). The signature list 204 contains one or more digital signatures that can be used to authenticate the identity of one or more signers of the signatures in the signature list 204.

Each digital signature of the data object 112 is based on both the content of the data object 112 and the signer's

US 6,510,516 B1

5

private key. Each of the digital signatures may be created through the use of a hash function and a private signing function that encrypts the data object using the private key. Each of the digital signatures also includes a public key that may be used to verify the authenticity of the data object 112.

In one embodiment of the invention, each of the digital signatures has an associated digital certificate. Digital certificates are issued by a certifying authority that vouches for the identities of those to whom it issues digital certificates with a given key.

When the public and private keys are available for the data object 112, the public key is sent to the certifying agency with some proof of identification. The certifying authority checks the identification and then sends the certificate requestor a certificate attesting to the binding between the name of the provider of the data object 112 and the public key along with a hierarchy of certificates, or certificate chain, verifying the certifying authority's public key. The provider of the data object 112 can present this certificate chain whenever desired in order to demonstrate the legitimacy of the provider's public key. Additional information regarding digital signatures and digital certificates is described in RSA Data Security for example.

The data object includes management information 205. The management information 205 can include the name of the provider of the data object 112, the name of the data object, and/or any other information that the provider of the data object 112 wants to include about the data object 112.

Also, the data object 112 includes one or more subcomponents 206. The subcomponents include the content of the data object 112. A description of each of the types of subcomponents 206 is set forth below with reference to FIG. 3.

Lastly, the data object 112 includes an export list 210. The export list 210 defines the procedures that are exported to peer data objects 118 and the animating system 100. The peer data objects 118 use the exported routines for accessing the subcomponents 206 that are associated with the data object 112. A description of the export list 210 is set forth below with reference to FIG. 5.

FIG. 4 is a block diagram illustrating the elements in each of the subcomponents 206 (FIG. 3). Each subcomponent 206 includes a name field 302, a type field 304, a data field 306, and a signature field 308. The name field 302 contains an arbitrary character sequence that identifies the subcomponent 206. The type field 304 of the subcomponent 206 includes a description of the type of the subcomponent 206.

In one embodiment of the invention, each of the subcomponents 206, is defined to fall within one of the six types: peer-wiring, animator-wiring, self-wiring, data, state, and code. The type of each of the subcomponents 206 determines which type of information is included in the data field 306. For convenience of description, each type of the subcomponents 206 is referred to below by the identifier that is defined in the type field 304. For example, a subcomponent having a type field 304 that identifies self-wiring is referred to as a self-wiring subcomponent. As another example, a subcomponent having a type field 304 that designates data is referred to as a data subcomponent.

In one embodiment of the invention, the peer-wiring subcomponents, the animator-wiring subcomponents, and the self-wiring components are each serialized JavaBeans. Additional information regarding JavaBeans can be found in the *JavaBeans API Specification, Versions* 1.01 published by Sun Microsystems, which is hereby incorporated by reference.

6

Each of the peer-wiring subcomponents, i.e., selected subcomponents 206 in the data object 112, describes the connection between state subcomponents in the data object 112 and state subcomponents in one of the peer data objects 118 (FIG. 1).

Each animator-wiring subcomponent includes a description of how to connect state components in the data object 112 to the animating system 100 (FIG. 1). Still referring to FIG. 3, a self-wiring component includes a description of how to connect two state subcomponents within the data object 112. Data subcomponents, state subcomponents, and code subcomponents are used to define the function of the data object 112 once the data object 112 is connected to the peer data objects 118 (FIG. 1).

In one embodiment of the invention, the data subcomponents, the state subcomponents, and the code subcomponents are implemented using the Java programming language. In this embodiment, each state subcomponent is a serialized JavaBean. Further, each code subcomponent is a Java class. It is noted, however, that in alternative embodiments of the invention, the code component can also comprise other types of code such as, for example, a Visual Basic Script, a JavaScript, or a dynamic linked library (DLL).

Lastly, the signature field 308 (FIG. 3) defines one or more digital signatures for the subcomponent 206. Each of the digital signatures in the signature field 308 is a unique identifier for each subcomponent similar to unique identifiers provided in the signature list 204 (FIG. 3).

FIG. 5 is a diagram illustrating the procedures of the export list 210. The export list 210 defines the list of procedures that are exported by the data object 112. The export list 210 includes a get-cell-signatures procedure 400 that provides the signature list 204 (FIG. 3) to the animating system 100 (FIG. 1). The animating system 100 (FIG. 1) uses the signature list 204 to determine the identity of the signers of the digital object 112.

Further, the export list 210 includes a get-data-object-id procedure 402. Upon invocation, the get-data-object id procedure 402 provides to a requester, such as the animating system 100 or the peer data objects 118, the digital object identifier 200 (FIG. 3). With reference to FIGS. 1 and 3, the animating system 100 can use the object identifier 200 to determine whether the data object 112 should be allowed to connect with the peer data objects 118.

Also, as shown in FIG. 5, the export list 210 includes a get-list-of-entries procedure 404. The get-list-of-entries procedure 404 provides to the animating system 100 (FIG. 1), a list of the names that are identified in the name field 302 (FIG. 4) in each of the subcomponents 206 (FIG. 3).

In addition, the export list 210 includes a get-signing-certificate procedure 406. Using the get-signing-certificate procedure 406, any of the peer data objects 118 via the animating system 100 can obtain the a digital certificate that is associated with one or more of the digital signatures that are in the data object 112 (FIG. 1).

Also, the export list 210 includes a get-entry-name procedure 408. The get-entry-name procedure 408 provides to a requester a handle to a selected one of the subcomponents 206 (FIG. 3). It is noted that before the requestor can request the handle to one of the subcomponent 206, the selected subcomponent should be wired to the requestor by the animating system 100.

The export list 210 also includes a get-peer-list procedure 412. The get-peer-list procedure 412 provides the peer list 202 (FIG. 3) to the animating system 100 (FIG. 1). The

US 6,510,516 B1

7                                                                8

animating system 100 uses the peer list 202 to determine whether each of the peer data objects 118 that may be needed by the data object 112 are contained within the client computer 102.

In addition, the export list 210 also defines a get-authenticator procedure 414. The get-authenticator procedure 414 provides the name of an authenticating system (not shown) that can be used to provide the conditions under which the data object 112 will allow itself to be connected to the peer data objects 118 (FIG. 1). In one embodiment of the invention, the authenticating system is one of the subcomponents in the data object 112. In another embodiment of the invention, the authenticating system is a component in the animating system 100. In yet another embodiment of the invention, the authenticating system is contained in one of the peer data objects 118.

The authenticating system examines a plurality of arbitrarily defined conditions regarding the data object 112 before the authenticating system allows the data object 112 to be connected to a target data object, such as one of the peer data objects 118. In one embodiment of the invention, the authenticating system examines the signatures in the signature list 204 and each signature field 308 in the subcomponents 206 to verify the identity of the target data object. Once the identity of a requester, such as one of the peer data objects 118, is determined, the authenticating system determines whether the requester should be allowed to connect with the data object 112.

Lastly, the export list 210 includes an activate-object procedure 418. The activate-object procedure 418 is used by the animating system 100 (FIG. 1) to activate the data object 112 after the animating system 100 connects the data object 112 to the peer data objects 118.

FIG. 6 is a diagram that illustrates the elements in a wiring data field. The wiring data field describes the content of the data field 306 (FIG. 4) for peer-wiring subcomponents, animator-wiring subcomponents, and self-wiring subcomponents. Each of the data fields 306 (FIG. 4) that are associated with the wiring subcomponents describes how to interconnect two of the state subcomponents. The data field defines a listener 500, a source 502, an add method 504, a remove method 506, and a source indicator 508.

The listener 500 contains a listener identifier that identifies one of the subcomponents 206 as being responsible for listening to events. As a counterpart to the listener 502, the source 502 contains a source identifier that identifies one of the subcomponents 206 as being responsible for sending events.

The add method 504 identifies a method on the source component to start the listener component receiving events. The remove method 504 identifies a method on the source component that may be invoked to stop the listener subcomponent from listening to events. The source identifier identifies the direction of the events identified by the listener 500 and the source 502. Additional information regarding connecting subcomponents in a Java embodiment may be found in the *JavaBeans API Specification, Version* 1.01 by Sun Microsystems, pp. 54–58.

FIG. 7 is a block diagram illustrating a data item 510 of exemplary content that may be contained in the data field 306 of a data subcomponent. It is noted that data can include, by way of example, a book, a poem, an article, bank account information, a contract, a multimedia presentation, or any other type data that a data content provider desired to protect in a secure environment.

FIG. 8 is a block diagram illustrating an exemplary item 512 of code that may be contained in the data field 306 (FIG.

4) of a code subcomponent. Each code subcomponent typically includes user-defined aggregate data types. For example, a code subcomponent may contain both data members representing the data types and function members that implement operations on the data types. In the example, as shown in FIG. 8, the code subcomponent contains a Java class.

Each of the state subcomponents define the instance information for one of the class subcomponents. For example, referring to FIG. 8, an instance of the Java class shown in FIG. 8 can include information regarding the state of the variable "count."

## System Operation

FIG. 9 is a flowchart illustrating a process for creating the data object 112 that is shown in FIG. 1. It is noted that the data object 112 can be created using any known object model, such as Java Beans, Active X, LiveConnect, and OpenDoc, or the System Object Model (SOM), or any object model that may be developed later. In one embodiment of the invention, the data object 112 is created on the server computer 106 via a data object packager (not shown). In this embodiment, each of the states shown in FIG. 9 correspond to a public method of the data object packager. A data object provider, that desires to create a data object, invokes each of the public methods of the data object packager in succession to create the data object. It is noted that in one embodiment of the invention, a data object 112 is created by the animating system 100.

Starting at state 604, the content provider desires to distribute some type of information to others. For instance, the information can include a book, a poem, an article, bank account information, a contract, a multimedia presentation, video, music, a universal resource identifier to dynamic content, such as streaming media, or any other type data that a data content provider desires to protect in a secure environment.

At the state 604, a digital object identifier 200 that uniquely identifies the data object 112 is added to the data object 112. In one embodiment of the invention, the data object identifier is provided by the animating system 100. In another embodiment of the invention, the data object identifier is acquired from a third party.

Continuing to a state 608, the management information 205 (FIG. 3) is input into the data object 112 (FIG. 1). The management information 205 can include the name of the provider of the data object 112, the name of the data object, and/or any other information that the provider of the data object 112 wants to include about the data object 112.

Next, at a state 612, the subcomponents 206 (FIG. 3) are added to the data object 112. The subcomponents include: animator-wiring subcomponents, self-wiring subcomponents, peer-wiring subcomponents, data subcomponents, and code subcomponents. The purpose of each of the foregoing subcomponents is described above with reference to FIG. 4.

Moving to a state 614, the peer list structures that collectively comprise the peer list 204 (FIG. 3) are added to the data object 112 (FIG. 1). Each peer list structure receives the name of a selected one the peer data objects 118 (FIG. 1), a version number of the selected peer data object, and a location identifier of where the selected peer data object may be located, if the selected peer data object cannot be found in the client computer 102 (FIG. 1).

Continuing to a state 618, each of the subcomponents 206 (FIG. 3) is digitally signed by one or more signers. Each of

US 6,510,516 B1

9

the digital signatures may by created through the use of a hash function and a private signing function that encrypts the resulting hash of the data object using a private key.

Next, at a state 622, the data object 112 is digitally signed by one or more signers. The data object 112 may be signed by the same process that is used to sign each of the subcomponents as described above with reference to the state 622. In one embodiment of the invention, the Certificate Security Suite by RSA Data Security of San Mateo, Calif. may be used for the signing process.

Finally, in a state 626, the data object 112 is stored in a data storage device, such as a disk. In one embodiment of the invention, the data object 112 is serialized using Java Serialization and is stored as a JAR file. In another embodiment of the invention, the data object 112 is stored as an ASCII text file.

FIG. 10 is a flowchart illustrating a process of integrating the data object 112 (FIG. 1) with the peer data objects 118 (FIG. 1). Starting at a state 700, the client computer 102 (FIG. 1) receives the data object 112 from a data object provider. The data object provider can be, for example, the database 104, the server computer 110, or the removable storage medium 110 as shown in FIG. 1.

In one embodiment of the invention, the animating system 100 (FIG. 1) is automatically notified of the presence of the data object 112 by the operating system (not shown) on the client computer 102 after the data object 112 is received by the client computer 102. In this embodiment, the operating system is configured to examine the management information 205 (FIG. 3) in the data object 112 to determine a handler for the data object. Further, in this embodiment, the management information 205 designates the animating system 100 as its handler.

It is noted that once the data object 112 is received by the client computer 102 (FIG. 1), the data object 112 is in an unusable state by the peer data objects 118. Before the data object 112 can be connected with the peer data objects 118, the identity of each of the peer data objects 118 needs to be established. Further, the animating system 100 needs to determine whether the peer data objects 118 are authorized to communicate with the data object 112.

Next, at a state 704 (FIG. 10), the animating system 100 (FIG. 1) authenticates the data object to ensure that the data object 112 has not been improperly altered or has been otherwise tampered with. The animating system 100 examines each of the signatures in the signature list 204 (FIG. 3) using a public key that may be obtained from the provider of the data object 112. Further, the animating system 100 may use the get-signing-certificate procedure 406 (FIG. 5) to analyze one or more digital certificates that are associated the data object 112.

Moving to a state 708 (FIG. 10), the animating system 100 (FIG. 1) uses the get-peer-list procedure 412 (FIG. 5) to obtain the peer list 202 (FIG. 3). Continuing to a state 712 (FIG. 10), the animating system 100 determines whether all of the required peer data objects 118 that are identified by the peer list 202 are present in the client computer 102. If all of the peer data objects 118 are not present, the animating system 100 proceeds to a state 714. At the state 714, the animating system 100 retrieves any of the non-present peer data objects 118. As discussed above, each of the peer list structures in the peer list 202 includes a location identifier that identifies where each of the non-present peer data objects 118 may be found. For example, the location identifier may reference the database 104 (FIG. 1), the server computer 106 (FIG. 1), the removable storage medium 110 (FIG. 1), or from some other depository of data objects.

10

If the animating system 100 (FIG. 1) cannot retrieve any of the non-present peer data objects 118, the animating system 100 stops and does not allow any further action regarding the use of the data object 112 (FIG. 1). However, if the animating system 100 can retrieve the non-present data objects, the animating system 100 proceeds to a state 716.

From either the decision state 712 or from the state 714, the animating system 100 (FIG. 1) proceeds to the state 716. At the state 716, the animating system 100 animates each of the peer data objects 118 (FIG. 1). To animate the peer data objects 118, the animating system 100 performs each of the states 700–730 (FIG. 10) in connection with each of the peer data objects 118. By executing the animating process on each of the peer data objects 118, the animating system 100 ensures that the peer data objects 118 have not been improperly altered or otherwise tampered with.

Next, at a state 720 (FIG. 10) the animating system 100 (FIG. 1) wires the data object 112 to itself. At state 720, the animating system 100 connects selected subcomponents 206 of the data object 112 to the animating system 100. In one embodiment of the invention, the animating system 100 includes a connection data object (not shown), similar in format to the data object 112, for communication with the data object 112.

In the state 720, the animating system 100 reads the data in the wiring data field 306 of each sub-component 206 as shown in FIG. 6, namely, the listener field 500, the source field 502, the add method field 504, the remove method field 506, and the source indicator field 508 to determine the proper connections for the data object 112. Additional information regarding connecting subcomponents may be found in the JavaBeans API Specification, Version 1.01 published by Sun Microsystems, pp. 54–58.

As part of the animator-wiring process, the animating system 100 (FIG. 1) invokes the get-authenticator procedure 414 (FIG. 5) that is associated with the data object 112 to retrieve the authentication system (not shown) for the data object 112. As was discussed above, the authentication system can reside in one or more places including, the data object 112, the animating system 100, or one of the peer data objects. The authentication system verifies for the animating system 100 whether a given connection should be made.

Continuing to a state 722, the animating system 100 (FIG. 1) interconnects the subcomponents 206 in the data object 112. Similar to the animator-wiring process, in the self-wiring process the animating system 100 examines the data wiring field in each of the self-wiring subcomponents 206 to determine how the data object 112 is to be constructed. Upon the identification of a peer-wiring subcomponent, the animating system 100 examines the contents of the peer-wiring component to determine the appropriate connections.

Similar to the animator-wiring process, in the self-wiring process, the animating system 100 (FIG. 1) consults the authentication system to determine whether a connection should be performed. For example, the data object 112 may contain a self-wiring subcomponent that indicates that a first subcomponent should be connected to a second subcomponent. However, the authenticating system may only allow the connection as long as the provider of the data object has funds maintained in a virtual account that is maintained by the authenticating system.

Moving to a state 726, the animating system 100 (FIG. 1) performs peer-wiring. The animating system 100 searches the subcomponents 206 to find peer-wiring subcomponents. In the peer-wiring process, the animating system 100 uses the information in the wiring data field to connect the subcomponents 206 that are identified by the wiring subcomponents.

US 6,510,516 B1

11

In the peer-wiring process, the animating system 100 (FIG. 1) determines whether the data object 112 is authorized to communicate with the peer data objects 118. Advantageously, each of the peer data objects 118 and the data object 112 can define, via the authentication system, various restrictions regarding their usage. As discussed above, each data object includes the get-authenticator procedure 414 (FIG. 5) that identifies the authentication system for the data object. The authenticating system defines the conditions of usage of regarding the data object.

For example, assume that the data object 112 (FIG. 1), according to the management information 205 (FIG. 3) in the data object 112, purports to be a cartoon animation for kids. However, in fact, the data object 112 has been tampered with and has been improperly modified such that it seeks out personal information from others. In this example, since the data object 112 has been changed, the animating system 100 cannot verify the signatures in the signature list 204 (FIG. 3) of the data object 112. Further, in this example, the peer data objects 118 define a personal finance program (not shown). If the data object 112 attempted to access the personal finance program, the animating system 100 (FIG. 1) would check with the peer data objects 118 to determine if the data object 112 should be authorized to access the peer data objects 118. In this instance, the authentication system of the peer data objects 118 would deny the request.

Thus, if the animating system 100 (FIG. 1) determines that the data object 112 (FIG. 1) is not authorized to access the peer data objects 118, the animating system 100 determines whether to stop or continue further action relating to the data object 112. Still referring to the state 726, if the animating system 100 determines that authorization is permitted, the animating system 100 then determines whether the peer data objects 118 are authorized to access the data object 112 via having each of the peer data objects 118 access their associated authentication system.

For example, assume that the data object 112 was created by the ACME corporation ("ACME"). In this example, the data object 112 includes in one of the subcomponents 206 a document that describes ACME's corporate policies. Further, in this example, the peer data objects 118 define a word processing system, and one of the peer data objects 118 is responsible for editing documents and another of the peer data objects 118 is responsible for viewing documents. One of the subcomponents 206 (FIG. 3) in the data object 112 may indicate that only system administrators are authorized to edit the data object 112. If the data object 112 is distributed to an employee, ACME can setup the data object 112 such that the data object 112 is not authorized to connect with the peer data object that is responsible for editing. In this example, the data object 112 would only be setup to be authorized to communicate with the viewing data object.

Finally, at a state 730, the animating system 100 (FIG. 1) initializes the data object 112 by invoking the activate-object procedure 418 (FIG. 5) that is associated with the data object 112.

The animating system 100 (FIG. 1) of the present invention enables the dynamic connection of data components in a secure environment. The animating system 100 ensures that before the data object 112 is connected to one of the peer data objects 118, that the peer data object has not been improperly altered. Further, the animating system 100 of the present invention includes a two-way security scheme, in which the data object depending on the identity of the peer data objects, authorizes the peer data objects to communicate with the data object. Conversely, each of the peer data

12

objects verify the contents of the data object. Each of the peer data objects may depending on the identity of the data object, determine whether to allow the data object to communicate with themselves.

The data objects of the present invention may be advantageously used to define various type of electronic commerce management solutions. For example, using the present invention, one of the peer data objects may act as a contract manager for a "managed" data object. Before an act is performed using the managed data object, the contract manager can require the payment of a fee by a user. Optionally, the contract manager may provide a "contract" data object that defines the terms of the usage of the managed data object. The contract data object can contain virtual money that is debited each time another data object requests an action from the managed data object. Further, the contract object can place variable restrictions regarding the usage of the managed data object, such as defining access to the managed data object for a particular time or for a particular number of uses. The variable restrictions can be dependent on one or more payment plans that may be selected by the other data objects.

Also, for example, the data object of the present invention could be advantageously used to define a buyer data object. The buyer data object can be distributed over the Internet with some virtual money and configured to look for the cheapest seller of a particular good. In this example, the buyer data object may be digitally signed by a bank that confirms that the data object has valid virtual money.

Further, for example, one or more seller data objects may be provided to sell a particular good. In one embodiment of the invention, when the buyer data object encounters the seller data object, the buyer data object could attempt to notify the provider of the buyer data object. In another embodiment of the invention, the buyer data object could be configured to negotiate with the seller data object. Advantageously, through the use of signatures and certificates, the buyer data object can verify the identity of the seller data object and confirm that the seller is actually in the business of selling the goods in question. Further, the seller agent can determine that buyer data object actually has valid virtual money to purchase the seller's goods.

The foregoing examples are but a few applications of the present invention. The animating system of the present invention enables new and limitless possibilities regarding new electronic commerce solutions.

While the above detailed description has shown, described, and pointed out novel features of the invention as applied to various embodiments, it will be understood that various omissions, substitutions, and changes in the form and details of the device or process illustrated may be made by those skilled in the art without departing from the spirit of the invention. The scope of the invention is indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

What is claimed is:

1. A method of controlling the usage of data in a computer having one or more peer data objects, the method comprising:

    providing a data object, the data object including a description of one or more of the peer data objects that are required for usage of the data object;

    determining whether the peer data objects are authorized to communicate with the data object;

US 6,510,516 B1

13

determining whether the data object is authorized to communicate with the peer data objects; and

connecting the data object to the peer data objects based upon authorization being granted such that the data object can communicate with the peer data objects and the peer data objects can communicate with the data object.

2. The method of claim 1, additionally comprising authenticating the identity of the data object.

3. The method of claim 1, additionally comprising authenticating the identity of each of the peer data objects.

4. The method of claim 1, additionally comprising:

determining the presence of the peer data objects; and

retrieving any of the peer data objects that are not present in the computer.

5. The method of claim 1, wherein the data object includes one or more subcomponents that define the usage of the data object in connection with the peer data objects.

6. The method of claim 1, wherein the peer data objects collectively define a software application.

7. The method of claim 1, wherein the software application is an Internet browser.

8. The method of claim 7, wherein the software application is an on-line virtual store.

9. The method of claim 1, wherein one of the peer data objects is a hardware device.

10. The method of claim 1, wherein the data object is encrypted.

11. The method of claim 1, wherein determining whether the peer data objects are authorized to communicate with the data object includes verifying at least one digital signature in each of the peer data objects.

12. The method of claim 1, wherein determining whether the data object is authorized to communicate with the peer data objects includes verifying at least one digital signature in the data object.

13. The method of claim 1, wherein the data object has at least one subcomponent, the subcomponent having an associated digital signature, and wherein determining whether the data object is authorized to communicate with the peer data objects includes verifying the digital signature associated with each subcomponent.

14. The method of claim 13, wherein the subcomponent contains data, and wherein the digital signature is a digitally encrypted hash of the content of the data in the subcomponent using a private key of the signer of the digital signature.

15. The method of claim 1, additionally comprising verifying the integrity of the data object.

16. The method of claim 1, wherein each of the peer data objects is a data object.

17. A system for controlling the usage of a data object, the system comprising:

one or more peer data objects, the peer data objects collectively defining a software application;

a parser capable of reading from a data object a description of one or more peer data objects that are required for use of the data object;

a validate data object module capable of determining whether the data object is authorized to communicate with one or more peer data objects;

a validate peer module capable of determining whether the peer data objects are authorized to communicate with the data object; and

a wiring module capable of controlling the connection of the peer data objects to the data object.

14

18. The system of claim 17, additionally comprising a validation module capable of verifying the integrity of the data object.

19. The system of claim 17, additionally comprising a validation module capable of authenticating the integrity of the peer data objects.

20. A data object that is configured to be dynamically wired to one or more other data objects, the data object comprising:

a description of one or more peer data objects that are required to be connected to the data object before the data object can be accessed by the peer data objects; and

at least one digital signature that identifies a provider of the data object.

21. The data object of claim 20, additionally comprising an authentication identifier that identifies an authentication system, the authentication system including one or more conditions of usage regarding the data object.

22. The data object of claim 20, wherein the digital signature was signed by a bank, and wherein the data object contains virtual currency.

23. A system for controlling the usage of data in a computer having one or more peer data objects, the system comprising:

means for reading a data object, the data object including a description of one or more of the peer data objects that are required for usage of the data object and configured into a state that is unusable by the peer data objects;

means for determining whether the peer data objects are authorized to communicate with the data object;

means for determining whether the data object is authorized to communicate with the peer data objects;

means for converting the data object into a state that is usable by the peer data objects; and

means for connecting the data object to the peer data objects such that data object can communicate with the peer data objects and the peer data objects can communicate with the data object.

24. The system of claim 23, additionally comprising means for authenticating the identity of the data object.

25. The system of claim 23, additionally comprising means for authenticating the identity of each of the peer data objects.

26. The system of claim 23, additionally comprising:

means for determining the presence of the peer data objects; and

means for retrieving any of the peer data objects that are not present in the computer.

27. The system of claim 23, wherein the data object includes one or more subcomponents.

28. The system of claim 23, wherein the peer data objects together define a software application.

29. The system of claim 28, wherein the software application is an Internet browser.

30. The system of claim 28, wherein the software application is an on-line virtual store.

31. The system of claim 23, wherein one of the peer data objects is a hardware device.

32. The system of claim 23, wherein the data object is encrypted.

* * * * *